[No. A059616. First Dist., Div. Three. Feb. 23, 1995.‡]

SAN FRANCISCO DESIGN CENTER ASSOCIATES, Plaintiff and Appellant, v.
PORTMAN COMPANIES et al., Defendants and Appellants.

‡Review granted May 11, 1995. Review dismissed and opinion ordered published March 14, 1996.

30

■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■

**COUNSEL**

Carey & Ready, Daniel J. Ready, Jr., John E. Carey, Jr., Musick, Peeler & Garrett, Louis S. Weller, Pillsbury, Madison & Sutro, Robert M. Westberg, Reginald D. Steer and David J. Saul for Plaintiff and Appellant.

Halley, Cornell & Lynch and Roger C. Peters for Defendants and Appellants.

**OPINION**

**SIMONS, J.**\*—The competition privilege is an affirmative defense to the tort of interference with prospective economic advantage. We hold that to defeat the privilege plaintiff must prove defendants committed an unlawful or illegitimate act which is independently actionable.

### FACTS[1] AND PROCEDURAL HISTORY

In December of 1985, plaintiff San Francisco Design Center Associates purchased real property at 555 Ninth Street, San Francisco (the Greyhound site), from Greyhound Corporation, intending to develop it as a wholesale furniture mart. Plaintiff's principals Robert Fippinger and Michael Oettinger, acting through Affiliated Capital Corporation, bought the property in plaintiff's name for $6.3 million. They borrowed $4.5 million from WestAmerica Bank, $3.1 million of which was paid to Greyhound. That loan was secured by a first deed of trust. Greyhound took back a note for $3.2 million which was secured by a second deed of trust. Both notes were due in one year.

Golden Gate Apparel Association (Association) is a nonprofit corporation whose members are independent apparel sales representatives. The main function of the Association is to conduct trade shows. In the 1980's the Association held approximately five trade shows annually in the Showplace Square Concourse which was owned by defendant Bill Poland. Many of the Association members and other apparel sales representatives had showrooms at 821 Market Street, a distance from the Concourse. In late 1986, the Association was searching for a developer who could build an apparel mart. The site committee sought a one-roof facility that would house exhibition

---

\*Judge of the Contra Costa Municipal Court sitting under assignment by the Chairperson of the Judicial Council.

[1]In setting forth the facts we view the evidence in the light most favorable to the prevailing party. (*City and County of San Francisco* v. *Golden Gate Heights Investments* (1993) 14 Cal.App.4th 1203, 1211 [18 Cal.Rptr.2d 467].)

space for trade shows, permanent showrooms for members who wanted them and temporary space for representatives wanting space only during trade shows.

In late 1986, plaintiff learned of the Association's search for an apparel mart developer. Plaintiff started to modify its project to accommodate the needs of the Association. In 1987, Michael Wolyn was president and Robert Friedberg was vice-president of the Association.[2] Both men served on the site committee. On May 1, 1987, Wolyn executed a letter of intent for the Association to lease space in plaintiff's proposed facility to be constructed on the Greyhound site.

In the late summer of 1987, plaintiff met with representatives of defendant The Portman Companies to discuss the possibility of a joint venture to develop an apparel mart. John C. Portman, Jr., the owner of The Portman Companies, is the architect and codeveloper of the Embarcadero Center, Hyatt Regency and Portman Hotel in San Francisco and the Atlanta Market Center[3] in Georgia. Sam Williams is an executive vice-president of one of the Portman Companies. Williams was aware that plaintiff had a close relationship with the Association.

On October 7, 1987, plaintiff met with Sam Williams, who was representing the Portman Companies and Michael Wolyn, who was acting on behalf of the Association. Williams and Wolyn had differences of opinion as to who was to control the project. Sometime during November of 1987, Williams told Fippinger, "We had to break two associations in the past, and I don't necessarily want to have to break another one." Nevertheless, negotiations on the project continued. On December 24, 1987, Wolyn and Friedberg, on behalf of the Association, executed a letter of commitment to enter into an apparel mart lease subject to ratification by the Association's board of directors, final adjustment to lease terms, and the satisfaction of the Association that plaintiff had the necessary financing commitments to complete the development. A copy of the commitment letter was sent to Sam Williams.

While the Portman group was negotiating with plaintiff, Sam Williams was also communicating with Bill Poland, president of Bay West Development Company (Bay West) and owner of the Showplace Square complex in San Francisco. Williams had known Poland since the early 1960's. In late

---

[2]In January of 1988, Wolyn became chairman and Friedberg became president of the Association.

[3]The Atlanta Market Center is a collection of mart businesses, i.e., wholesale centers for the furniture, carpet, apparel, gift, and decorative arts industries.

November or early December of 1987, Poland told Williams he intended to develop an apparel mart on the Yellow Cab site near Showplace Square. Poland had received a letter from Wolyn, dated November 5, 1987, which indicated the Association's interest in Poland's proposed mart project on the Yellow Cab site. Williams decided to negotiate a partnership arrangement with Poland the first week of December. During Christmas week Williams informed Fippinger he was going to work with Poland.

On January 5, 1988, Williams and another Portman employee met with Wolyn in New York. Williams told Wolyn the Portman Companies would form a joint venture with Bay West, they would develop the Yellow Cab site and they wished to have the Association make a commitment as tenants. Williams stated plaintiff was manipulating the association, plaintiff would not be able to package a deal, and indicated the Portman/Bay West project would be built with or without the participation of the Association. Wolyn responded that the Association felt obligated to negotiate exclusively with plaintiff for at least six weeks. Wolyn requested that if the Portman Companies wished to communicate with the Association, it should do so in writing or through the Association's attorney.

Nevertheless, defendants continued to talk with Association members as well as Al Cramer and Howard Lester who were members of the board of directors. In January 1988, Portman/Bay West hired Cheri Randall-Robinson, a former board chairman and past president of the Association, as a leasing agent for their project.

On January 7, 1988, one day before an Association board of directors meeting and right before the January market show, the Portman Companies and Bay West issued a press release informing the public of its apparel mart project. Wolyn perceived the timing of the announcement as a power play to manipulate the Association.

On January 11, 1988, plaintiff's attorney wrote a letter to Sam Williams. He stated Williams's contacts with Wolyn and the timing of the press release constituted actionable interference with the business relationship between plaintiff and the Association. The letter demanded that the Portman Companies and Bay West cease and desist such activities.

Believing the Association had no firm commitment to plaintiff, the Portman/Bay West project proceeded. A promotional book describing the project was delivered to each member of the Association's board of directors and potential tenants were actively solicited. Cheri Randall-Robinson told Wolyn that certain clothing manufacturers such as Levi Strauss, Jessica McClintock

and Joanie Char had made commitments to the Portman/Bay West project. Members of the Association's executive committee were invited to Atlanta at Portman's expense for a presentation, although none accepted.

The Portman Companies conducted marketing strategy meetings in Atlanta. The Portman group wanted to get the Association as a tenant. However, even if the Association did not lend its support to the project, the Portman group intended to proceed without it. If the Portman group could not get the Association as a tenant, it would break the Association's hold by signing up individual members.

Meanwhile, plaintiff and Pacific Union Company agreed to form a joint venture to build an apparel mart on the Greyhound site. The parties operated under the terms of a preliminary letter agreement until April of 1988.

On February 19, 1988, plaintiff and the Association executed a lease and supplementary apparel show agreement. At the same time, a letter setting forth two conditions precedent to the effectiveness of the lease and show agreement was signed by the parties. One condition was "Receipt by San Francisco Design Center Associates of necessary financing commitments to complete the proposed development [,] such commitments to be received no later than April 15, 1988 and such commitments to be satisfactory to the Golden Gate Apparel Association."

As previously stated, when plaintiff bought the Greyhound site in 1985 it executed promissory notes to WestAmerica Bank and Greyhound. Plaintiff was in default on both notes in early 1987. In May 1987, Greyhound purchased the bank's interest in the property. Greyhound agreed to forbear foreclosing on the property for 90 days and was willing to grant further delays if plaintiff's project appeared to be progressing. However, on January 7, 1988, Greyhound notified plaintiff it would only agree to further extend the forbearance period to March 15, 1988, on condition that plaintiff execute a lease with the Association on or before February 15, 1988, and plaintiff demonstrate to Greyhound's satisfaction that a joint venture lender-equity partner was willing to make a substantial investment in the project. On March 17, 1988, Greyhound foreclosed on the property. Plaintiff never informed the Association it had lost the property. A week later Greyhound informed plaintiff the property could be purchased for $7 million.

On March 25, 1988, plaintiff advised the Association that it had reached an understanding with an investment group to commit $9 million to plaintiff's project and that a good faith deposit of $500,000 was expected within two weeks.

Coincidentally, this was the same date that Portman/Bay West sent two letters. The first was addressed to Friedberg. It stated the Portman/Bay West project had received positive responses from potential tenants, had established a major financial endorsement, and had progressed in obtaining a final building permit.

The second letter was sent to the members of the Association. It noted that the Association had two options for the Association "home." The letter stated in part: "Your organization is in the process of making a decision that will affect your working environment for years to come. *Be a part of that decision. Don't stand by passively.* Be aware of the issues at hand and make a statement for the proposed apparel facility in San Francisco that will provide the long term support and success you and your organization deserve." (Italics in original.) The letter invited the individual Association members to a cocktail reception on April 15, 1988, during the next market show.

Although Wolyn and Friedberg were committed to plaintiff's project, some of the board members, as well as many Association members, questioned why the Portman/Bay West project was not being considered. As a result of the Portman/Bay West March 25 letter, on March 28, 1988, the Association's board concluded that at least some members felt it would be in the Association's best interest to listen to the Portman/Bay West proposal.

Pursuant to the lease agreement, April 15, 1988, was the deadline for plaintiff to produce the necessary financing commitments for its proposed mart. On that day plaintiff delivered to the Association a letter from an attorney describing continuing negotiations between plaintiff and a Japanese investment group. A memorandum of understanding had been negotiated and was expected to be executed on April 17, 1988.[4]

April 15, 1988, was also the beginning of another of the Association shows. A general membership meeting had been called to announce the board's decision to accept plaintiff's project. At the membership meeting, Friedberg announced that plaintiff's proposal was being accepted. Membership reaction was very mixed. There were questions regarding the validity of plaintiff's ability to perform and regarding the board's failure to consider the Portman/Bay West project. Ultimately, the meeting adjourned without any vote. Despite the reaction of the membership, when Friedberg left the meeting he told Fippinger and Oettinger that they had a deal and offered congratulations.

---

[4]The memorandum of understanding was never signed.

On the same evening Portman/Bay West hosted its cocktail party, which featured a marketing presentation for prospective tenants of their apparel mart project. At the party an Association member, Ray Totten, spontaneously took the microphone and argued that the Association board should have considered the Portman/Bay West project.

On April 16, Friedberg wrote a letter to the Association's membership which was distributed at the show. The letter stated that plaintiff's project had been funded.

On April 20, the Association's counsel wrote to plaintiff. He stated that because the February 19 conditions precedent had not been satisfied, the lease was terminated. The letter was later withdrawn, then reinstated on April 25, 1988. The April 25 letter also referred to "pressure" on the Association's board to review presentations by other developers for an apparel mart facility. The Portman/Bay West group was eventually selected to develop the apparel mart.

Plaintiff's first amended complaint alleges various causes of action including breach of contract and intentional interference with contract, as well as intentional and negligent interference with economic relationship. At the commencement of the trial, the court ruled that the Greyhound foreclosure and trustee's sale had extinguished the February 19, 1988, lease. However, the court indicated that plaintiff could amend its complaint and attempt to prove a subsequent agreement with the Association after the March 17, 1988, extinguishment. Because no evidence of a subsequent agreement was offered, nonsuit was granted on all causes of action against the Association and on the allegations of interference with contract against the Portman/Bay West defendants.

Trial continued against the Portman/Bay West defendants on the theory of negligent and intentional interference with prospective economic advantage. The trial was bifurcated between compensatory damages and punitive damages. In the first phase the jury was instructed on the elements of intentional interference with prospective economic advantage,[5] and negligent

---

[5]The court instructed as follows: "The essential elements of a cause of action for intentional interference with prospective economic advantages are: [¶] One, an economic relationship existed between the plaintiff and Golden Gate Apparel Association containing a probable future economic benefit or advantage to plaintiff. [¶] Two, the defendants knew of the existence of the relationship. [¶] Three, the defendants intentionally engaged in acts or conduct designed to interfere with or disrupt this relationship. [¶] And, four, the economic

interference with prospective economic advantage. It was also instructed on the privileges of competition[6] and free competition.[7]

The jury found that defendants had both intentionally and negligently interfered with plaintiff's prospective economic advantage and that their acts were not privileged. Compensatory damages were fixed at $800,000. The jury also found there was "oppression, fraud or malice" in the conduct on which they based their finding of liability.

In the second phase of the trial on punitive damages, the jury fixed the punitive damages at $200,000 for defendant Poland, $500,000 for defendant Williams, and $4.5 million for defendant John Portman.

The Portman/Bay West defendants moved for judgment notwithstanding the verdict (n.o.v.) and for a new trial. Plaintiff moved for new trial on the issue of compensatory damages. The court granted defendants' motion for judgment n.o.v. on the cause of action for negligent interference with prospective economic advantage, granted defendants' motion for new trial on the issue of excessive punitive damages, and denied both defendants' and plaintiff's motions for new trial on other grounds.

---

relationship was actually interfered with or disrupted. [¶] And, five, the acts of the defendants were a legal cause of damage to plaintiff."

[6]In instructing the jury on the affirmative defense of privilege the court stated: "The privilege of competition is a complete defense to a claim of interference with prospective economic advantage. Ordinarily a person who engages in business with the primary aim of making profits for himself or herself is not liable for business losses suffered by a competitor. [¶] The essential elements of the privilege of competition are: [¶] One, the plaintiff and defendant were engaged in economic competition. [¶] Two, the economic relationship between the plaintiff and the Golden Gate Apparel Association concerned a matter involved in the competition between the plaintiff and the defendant. [¶] Three, the defendant did not use wrongful means. [¶] And, four, the defendants' purpose was at least in part to advance his own interest in competing with the plaintiff."

[7]The court stated: "Free competition is also a privilege that can be proven by defendants as an affirmative defense. The policy of the law has always been in favor of free competition. [¶] If the plaintiff's contractual relations are contemplated or potential, it is in the public interest for any competitor to be free to divert such relations to himself or itself by all fair and reasonable means. [¶] Where the interference by a defendant involves no more than recognized trade practices, such as advertising, solicitation or price competition, plaintiff's loss as a result of such competition is not recoverable. [¶] . . . The plaintiffs claimed the defendants made untrue statements and misrepresented material facts about defendants' own project, and that these misrepresentations interfered with plaintiff's prospective economic advantage. [¶] Plaintiff is not entitled to recover for any damages that may have been caused by statements made by defendants about defendants' own project, even if untrue, unless the sole reason for making the statements was to harm the plaintiff, and the legitimate interest of the defendant is practically eliminated from consideration for making the statement."

Defendants The Portman Companies, John C. Portman, Jr., Sam Williams, Bill Poland, and Bay West now appeal from the judgment that they interfered with plaintiff's prospective economic relationship. Plaintiff cross-appeals on various grounds.

DISCUSSION

*Intentional Interference with Prospective Economic Advantage*

█ It is firmly established that the requisite elements for proving the tort of intentional interference with prospective economic advantage are "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." (*Youst* v. *Longo* (1987) 43 Cal.3d 64, 71, fn. 6 [233 Cal.Rptr. 294, 729 P.2d 728, 85 A.L.R.4th 1025].)

While not requiring proof of a binding contract, the tort protects the same interest in stable economic relationships as the tort of interference with contract. (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 826-827 [122 Cal.Rptr. 745, 537 P.2d 865].) The primary difference between interference with prospective economic advantage and interference with contract is that a broader range of privilege to interfere is recognized when the relationship or economic advantage interfered with is only prospective. (*Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [270 Cal.Rptr. 1, 791 P.2d 587]; *Shida* v. *Japan Food Corp.* (1967) 251 Cal.App.2d 864, 866 [60 Cal.Rptr. 43].)

█ It is also settled that an affirmative defense to the tort of interference with prospective economic advantage is the privilege of competition. Restatement Second of Torts section 768 provides: "(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if: [¶] (a) the relation concerns a matter involved in the competition between the actor and the other and [¶] (b) the actor does not employ wrongful means and [¶] (c) his action does not create or continue an unlawful restraint of trade and [¶] (d) his purpose is at least in part to advance his interest in competing with the other. [¶] (2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the

contract is not terminable at will." The competitive privilege clearly is inapplicable to interference with an existing contract unless the contract is terminable at will. (See, e.g., *Show Management* v. *Hearst Pub. Co.* (1961) 196 Cal.App.2d 606, 618 [16 Cal.Rptr. 731].)

The privilege, as articulated in the Restatement, has been adopted in California. (*Charles C. Chapman Building Co.* v. *California Mart* (1969) 2 Cal.App.3d 846, 855-856 [82 Cal.Rptr. 830].) Whether it constitutes an affirmative defense in a particular action is a factual issue to be decided upon all the circumstances in the case. (*Bert G. Gianelli Distributing Co.* v. *Beck & Co.* (1985) 172 Cal.App.3d 1020, 1054 [219 Cal.Rptr. 203]; *Lowell* v. *Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 20 [144 Cal.Rptr. 664, 6 A.L.R.4th 184].)

It is not entirely clear what constitutes such "wrongful means" as will defeat the defense. The Restatement indicates physical violence, fraud, and the threat of civil and criminal litigation, as well as unlawful conduct would constitute the wrongful conduct contemplated by clause (b). (See Rest.2d Torts, § 768, com. e.)

As early as 1935, one California court stated: " 'Competition in business, though carried to the extent of ruining a rival, is not ordinarily actionable, but every trader is left to conduct his business in his own way, so long as the methods he employs do not involve wrongful conduct such as fraud, misrepresentation, intimidation, coercion, obstruction, or molestation of the rival or his servants or workmen, or the procurement of the violation of contractual relations. If disturbance or loss comes as the result of competition, or the exercise of like rights by others, as where a merchant undersells or oversells his neighbor, it is *damnum absque injuria.*' " (*Katz* v. *Kapper* (1935) 7 Cal.App.2d 1, 4 [44 P.2d 1060], quoting 15 R.C.L., p. 73; Prosser & Keeton, Torts (5th ed. 1984) § 130, pp. 1012-1013.)

However, the *Katz* opinion does little to elucidate what is meant by "intimidation, coercion, obstruction, or molestation of the rival." In *Katz*, the plaintiff alleged defendants had maliciously called meetings of the plaintiff's customers and threatened that they would be driven out of business if they continued to purchase fish from the plaintiff, but promised that if they bought fish from the defendants they would be given sufficient reductions in price so that they could successfully compete with the plaintiff and drive him out of business. The defendant subsequently opened a store and sold fish at prices which were less than wholesale. The Court of Appeal held that these alleged acts constituted coercion; however, they were not unlawful. They

related solely to business competition between the parties, and the fact that the methods were ruthless or unfair did not stamp them as illegal. (*Katz* v. *Kapper, supra,* 7 Cal.App.2d at p. 6.) The decision implies the coercive act must be illegal; if the "coercion" in *Katz* was insufficient to defeat the competition privilege, it is difficult to imagine what conduct would be sufficient if it was not unlawful.

More recently, another court stated: " '[I]t is no tort to beat a business rival to prospective customers. Thus, in the absence of prohibition by statute, illegitimate means, or some other unlawful element, a defendant seeking to increase his own business may cut rates or prices, allow discounts or rebates, enter into secret negotiations behind the plaintiff's back, refuse to deal with him or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability.' " (*A-Mark Coin Co.* v. *General Mills, Inc.* (1983) 148 Cal.App.3d 312, 324 [195 Cal.Rptr. 859], quoting Prosser, The Law of Torts (4th ed. 1971) § 130, pp. 954-955.) *A-Mark Coin* clearly holds the defendant's actions must be unlawful; the competition privilege is defeated only where the defendant engages in unlawful or illegitimate means. (Accord, *Saunders* v. *Superior Court* (1994) 27 Cal.App.4th 832, 843 [33 Cal.Rptr.2d 438].)

Plaintiff cites *Bert G. Gianelli Distributing Co.* v. *Beck & Co., supra,* 172 Cal.App.3d at page 1054 and *Winn* v. *McCulloch Corp.* (1976) 60 Cal.App.3d 663, 672 [131 Cal.Rptr. 597], for the proposition that defendants may be found liable for interference with prospective economic advantage even if they used lawful means to interfere. We note, however, that *Gianelli* never discussed the affirmative defense of competitive privilege as set forth in section 768 of the Restatement Second of Torts. In *Winn,* the court discussed the tort of intentional inducement of breach of contract. The competition privilege does not apply in such a case. (Rest.2d Torts, § 768, subd. (2).)

■ We conclude that the privilege of competition constitutes a valid affirmative defense to a cause of action for intentional interference with prospective economic advantage. In order to defeat the privilege the defendant's conduct must be unlawful or illegitimate. That is, when a claimant charges its competitor with interference with prospective economic advantage and the competitor raises the competition privilege as a defense, the

claimant must show the competitor's conduct violated a statute or constituted a tort such as fraud or unfair competition.[8] The defendant's conduct must be independently actionable.[9] (See, e.g., *Conoco Inc.* v. *Inman Oil Co., Inc.* (8th Cir. 1985) 774 F.2d 895, 907; *Doliner* v. *Brown* (1986) 21 Mass.App. 692 [489 N.E.2d 1036, 1039-1040].)

Requiring proof that the competitor's wrongful conduct is independently actionable will provide a clearer guide to competitors in the conduct of their business affairs. Detached from the concepts of actionable or unlawful, the term "wrongful" provides little assistance in guiding future activities. In its reply brief, the plaintiff lists numerous acts by the Portman defendants it considers "wrongful."[10] Many of these acts were certainly wrongful, in the sense that they were inappropriate. Plaintiff's reliance on them, however, shows the error in its argument: The term "wrongful" is far too broad and covers much activity which should not defeat the competition privilege.

In closing argument plaintiff charged that "Portman and Bay West subscribe to a theory of business which could be best described as the Attila the Hun School, scorch the earth policy, anything to win." While the imagery was vivid it could not defeat the competitive privilege. Plaintiff presented no evidence of acts sufficiently wrongful to constitute actionable, unlawful or illegitimate conduct.

Plaintiff argues the March 25 letter from Williams and Poland to the Association members which stated that the Association had two options for the organization's future home was false, since the Association was fully committed to plaintiff's project and had even signed a contract that all parties thought was in effect at this time. Plaintiff ignores that the contract was subject to conditions precedent which had not been satisfied. It is

---

[8]The tort of unfair competition includes threats of groundless suits as contemplated in Restatement Second of Torts section 768, comment e. (See Prosser & Keeton, Torts, *supra*, § 130 at p. 1015.)

[9]Simply because the competition privilege is defeated only by conduct which is independently actionable does not render the cause of action in this case redundant. The damages recoverable for the underlying tort may be far smaller than those for interference with prospective economic advantage. Thus if companies A and B are competing for a piece of lucrative business and A uses violence against the employees of B to prevail, these employees could presumably sue for battery. B's damages for intentional interference with prospective economic advantage, which depend in part on proof of the torts committed against its employees, would be far larger, however.

[10]The following examples are taken from that list. "[T]he Portman defendants were telling the [Association] that you better deal with us now or the terms will be worse later." "Williams also told the [Association] that plaintiff's building was too small." "Williams intended to communicate that Pacific Union Company lacked the necessary professional background to operate a mart."

hornbook law that an actionable misrepresentation must be made about past or existing facts; statements regarding future events are merely deemed opinions. (*Nibbi Brothers, Inc.* v. *Home Federal Sav. & Loan Assn.* (1988) 205 Cal.App.3d 1415, 1423 [253 Cal.Rptr. 289]; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 678, p. 779.) Here, the letter's implied representation about a future fact was not actionable.

Plaintiff next asserts the Portman/Bay West attempt to intimidate the Association by stating they would build their project with or without the Association was a wrongful attempt to break the Association. As discussed in *Katz* v. *Kapper, supra,* 7 Cal.App.2d 1, such conduct was insufficient to defeat the privilege of competition.

Plaintiff next points to statements by Williams to the effect that plaintiff's project could not be financed and its proposed building was too small as examples of "molestation of the rival." We view such statements as nonactionable statements of opinion.

Plaintiff also maintains a February 16, 1988, letter from Williams to Wolyn, which stated that the Portman/Bay West group had already received commitments for permanent showroom leases, was an outright lie. Preliminarily, we note the term "commitment" is somewhat ambiguous. Moreover, statements about a competitor's own project, even though misleading, are not sufficient to avoid the competitor's privilege. (*Show Management* v. *Hearst Pub. Co., supra,* 196 Cal.App.2d at p. 616.) This rule is equally applicable to plaintiff's claim that the March 25 letter to Association misrepresented that the Portman/Bay West project had established a major financial endorsement.

Plaintiff argues that Williams told Wolyn and Friedberg that February 15, 1988, was an absolute date in Greyhound's mind and that further forbearance would not be forthcoming when Williams knew this to be untrue. There was no direct evidence of this conversation. The only evidence of the communication was provided by Fippinger, who testified that in January 1988, after Greyhound extended the forbearance deadline to March, he advised Wolyn and Friedberg of the extension. Over a defense objection, Fippinger stated that Wolyn and Friedberg were concerned that February 15 was an absolute deadline and they had gotten this impression from Williams. Even if this hearsay could form the basis for finding a misrepresentation, there is no evidence of reliance or damage resulting from it.

Plaintiff refers to several other instances of alleged coercion or intimidation. These include implied threats to the Association to deal with Portman/Bay West or the terms would be worse later, creation of confusion among

members of the Association, pressure brought upon the Association to disregard its commitment to plaintiff, an attempt to discredit Wolyn and Friedberg, the implication that plaintiff and Pacific Union Company lacked the necessary professional background to operate a mart, and misrepresenting that major manufacturers such as Levi Strauss, Jessica McClintock and Joanie Char were committed to their building. None of these activities were anything other than aggressive competition. They did not constitute actionable unlawful or illegitimate conduct.

In conclusion, we find there was insufficient evidence to defeat defendants' assertion of the competition privilege. Accordingly, the verdict finding Portman, Williams, Bay West and Poland liable for intentional interference with prospective economic advantage must be reversed.

*Extinguishment of Lease*

At trial the parties stipulated that 1) plaintiff and the Association executed a lease on February 19, 1988, 2) the lease was subordinate to the Greyhound deed of trust,[11] 3) on March 17, 1988, plaintiff lost title to the site as a result of foreclose and sale at a trustee sale, and 4) plaintiff never reacquired the property. Relying on *Dover Mobile Estates* v. *Fiber Form Products, Inc.* (1990) 220 Cal.App.3d 1494, 1498 [270 Cal.Rptr. 183], which holds that a foreclosure proceeding extinguishes a lease which is subordinate to the deed of trust, the court ruled that the lease was extinguished by the foreclosure sale of the Greyhound site.

In its cross-appeal plaintiff contends the court erred in finding the agreements between plaintiff and the Association were extinguished by the foreclosure sale of the Greyhound site. It does not dispute that when property is sold under a trust deed, the purchaser obtains title free and clear of all encumbrances subsequent to the deed of trust. (*R-Ranch Markets #2, Inc.* v. *Old Stone Bank* (1993) 16 Cal.App.4th 1323, 1328 [21 Cal.Rptr.2d 21]; *Dover Mobile Estates* v. *Fiber Form Products, Inc., supra,* 220 Cal.App.3d at p. 1498.) Rather, it maintains the extinguishment principle articulated in *Dover* and *R-Ranch Markets #2* is only applicable to tenants in possession; it is inapplicable to contract rights between a prospective landlord and tenant. We disagree.

---

[11]Paragraph 25 of the lease provided in part: "Without the necessity of any additional document being executed by Tenant for the purpose of effecting a subordination, this Lease shall be subject and subordinate at all times to: . . . (b) the lien of any mortgage or deed of trust which may now exist or hereafter be executed in any amount for which said Center, land, ground leases or underlying leases, or Landlord's interest or estate in any of said items, is specified as security."

Plaintiff supports its contention by drawing an analogy to those cases which hold that an individual may contract to convey land he or she may not own and will not be in default on the contract unless he or she is unable to convey title at the time of performance. (See *Hanson* v. *Fox* (1909) 155 Cal. 106, 108 [99 P. 489]; *Armstrong* v. *Sacramento V. R. Co.* (1921) 52 Cal.App. 110, 115 [198 P. 217].) The same principle applies where a seller initially owns real property, loses title by foreclosure, but reacquires the property before the time for conveyance to the buyer. (See *Lloyd* v. *Locke-Paddon Land Co.* (1935) 5 Cal.App.2d 211 [42 P.2d 367].) Although no case so holds, plaintiff maintains the same doctrine should apply to leases.

The difficulty with plaintiff's position is that it fails even under contract law. The parties in this case executed an agreement wherein the Association subordinated its interest to existing or prospective liens created by a mortgage or deed of trust. According to paragraph 25 of the agreement the lease was subordinate "at all times." Subsequently, Greyhound foreclosed and plaintiff never acquired the property again.[12] Thus, any contractual rights the Association held on February 19, 1988, were destroyed at the time of the foreclosure.

Plaintiff also argues that the contingent nature of its lease with the Association makes the extinguishment principle inapplicable. As we understand the argument, since plaintiff was not required to satisfy the conditions until April 15, 1988, the March 1988 foreclosure was irrelevant. However, plaintiff cites no authority for the proposition that the extinguishment doctrine is inapplicable if the lease contains conditions precedent.

Plaintiff next contends that if the lease was extinguished at the time of the March 1988 foreclosure, the conduct of the parties constituted the creation of a new contract on or about April 15, 1988. It maintains that by congratulating Fippinger on April 15 and announcing to Association members that plaintiff had financing, the Association confirmed the creation of a set of contracts on April 15 on the terms negotiated and signed February 19. The contention must fail for the simple reason that the Association was unaware there had been a foreclosure on March 17. Therefore, there could be no meeting of the minds to create a new agreement on April 15.

Finally, plaintiff asserts the trial court abused its discretion in determining that the punitive damages were excessive. Because we hold that the judgment in favor of plaintiff must be reversed we do not address this issue.

---

[12]Since plaintiff never reacquired the property, we need not discuss the doctrine of revival of subrogated interests pursuant to *Barberi* v. *Rothchild* (1936) 7 Cal.2d 537, 538-540 [61 P.2d 760].)

## DISPOSITION

The judgment in favor of plaintiff and against The Portman Companies, John C. Portman, Jr., Sam A. Williams, Bay West Development Company and Bill R. Poland on the claim for interference with prospective economic advantage, is reversed. The order denying these defendants' motion for judgment notwithstanding the verdict on this claim is reversed. The trial court is directed to enter judgment in favor of these defendants on this claim of interference with prospective economic advantage. The order granting these defendants' motion for nonsuit on plaintiff's contract claims is affirmed.

The judgment of dismissal in favor of Golden Gate Apparel Association is affirmed.

Plaintiff shall pay the costs of all defendants on the appeals and cross-appeal.

Chin, P. J., and Merrill, J., concurred.