**PUBLISH**

# UNITED STATES COURT OF APPEALS
**Filed 11/14/96** **TENTH CIRCUIT**

---

DP-TEK, INC.,

     Plaintiff-Appellant,

v.

AT&T GLOBAL INFORMATION
SOLUTIONS COMPANY, fka NCR
CORPORATION,

     Defendant-Appellee.

No. 95-3228

---

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 94-CV-2115)

---

Gregory L. Musil (R. Lawrence Ward and P. John Brady, with him on the briefs), of Shughart, Thomson & Kilroy, P.C., Overland Park, Kansas, for Plaintiff-Appellant.

Edwin L. Noel (Thomas B. Weaver, of Armstrong, Teasdale, Schlafly & Davis, St. Louis, Missouri, and Truman K. Eldridge and Darren S. Black, of Armstrong, Teasdale, Schlafly & Davis, Kansas City, Missouri, with him on the brief), of Armstrong, Teasdale, Schlafly & Davis, St. Louis, Missouri, for Defendant-Appellee.

---

Before **SEYMOUR**, Chief Judge, **PORFILIO** and **ANDERSON**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

DP-Tek, Inc., brought this action against AT&T Global Information Solutions Company, formerly known as NCR Corporation,[1] alleging tortious interference with an existing contract and with a prospective contract. Prior to trial, the district court granted NCR's motion for summary judgment on both claims. DP-Tek, Inc. v. AT&T Global Info. Co., 891 F. Supp. 1510 (D. Kan. 1995). DP-Tek appeals only with respect to the claim regarding interference with a prospective contract. We affirm.

I.

The pleadings and discovery evince the following undisputed facts. In late 1990, Venture Stores, Inc., initiated the Store Automation Project (Project) to upgrade the three components of its cash register and sales recording system. The three components consisted of Point of Sale (POS) software, POS hardware, and an In-Store Processor (ISP). This dispute arises out of the competition between DP-Tek and NCR to win the contract for the POS hardware component.

---

[1] AT&T acquired NCR in 1991 and subsequently renamed the company AT&T Global Information Solutions Company. We will refer to defendant as NCR, however, because DP-Tek's claims arise out of conduct that occurred prior to the change in name.

In early 1991, Venture sent a Request for Proposal (RFP) to several companies interested in providing services and products to upgrade the components. Venture explained in the RFP that different companies could supply different components and stated with respect to proprietary codes only that they could be included. DP-Tek submitted a proposal for the POS hardware, based upon a retrofit of Venture's existing POS hardware.[2] NCR submitted proposals for the POS hardware and ISP components, based upon new equipment. Research Computer Services (RCS), a business partner of NCR, submitted a proposal for the POS software. Other companies also submitted proposals.

In September 1991, Venture and DP-Tek executed a Product and Service Master Agreement (Master Agreement) which set forth general guidelines, including a confidentiality provision, for any potential product orders between the two companies. Venture and DP-Tek also signed a contract under which DP-Tek would sell Venture eight retrofit prototype units for evaluation. In December, DP-Tek delivered six of the units, for which Venture paid $80,000. Other companies supplied new off-the-shelf units for Venture's evaluation.

By April 1992, Venture had determined to accelerate the implementation of the Project and solicited amended or additional proposals to obtain more

---

[2] DP-Tek's proposal was approximately $10 million less than those of most competitors, including NCR, because it was the only proposal that did not include the purchase of new units.

competitive terms. On April 17, DP-Tek submitted its final proposal reflecting amended quantity, delivery, installation, and pricing terms. On April 30, Venture telephoned to inform DP-Tek it had been selected for the POS hardware component. During the telephone conversation, DP-Tek requested a one million dollar downpayment. Venture responded that it could not agree to such an amount and that the downpayment was a problem which would have to be resolved on a later date. Venture also contacted RCS and NCR to inform them they had been selected for the POS software and ISP components respectively.

Between September 1991 and May 1992, changes in the marketplace brought about significant decreases in the cost of new POS hardware. In early May, IBM submitted a revised proposal for the POS hardware component reflecting a substantial price reduction. In addition, NCR informed Venture that because it had been selected for the ISP component it could offer a more competitive price on the POS hardware component. Venture stated that no final contract had been executed with DP-Tek and encouraged NCR to submit an additional proposal. Shortly thereafter, Venture supplied NCR a price range which Venture thought would make the NCR proposal competitive with DP-Tek's proposal.

In early May an NCR manager, Ms. Brenda K. Pohl, visited a Venture location on other business and overheard conversations regarding one of DP-

Tek's prototypes. She asked if an NCR team could view the prototype and was told that it could. On May 13, an NCR engineer inspected and photographed the prototype and prepared a memorandum which contained his findings.

Venture and DP-Tek continued to work on the details of a contract for the retrofit units. On May 19, Venture met with DP-Tek and RCS to address the integration of DP-Tek's retrofit unit and RCS' POS software. During the meeting, all parties were aware that the successful integration of the hardware and software would be facilitated by a "source code" which RCS licensed from NCR. NCR owned the source code but refused to provide it to DP-Tek. Other possibilities for integration were discussed but the parties never resolved the issue.

On May 20, NCR presented an amended proposal to Venture that was significantly less costly than its original bid. During the presentation, NCR made various comparisons between DP-Tek's retrofit unit and its own proposed new unit.[3] Venture ultimately signed a contract with NCR in August 1992, and NCR installed the POS hardware. DP-Tek thereafter commenced this action alleging tortious interference.

---

[3] Several of the comparisons were based on information NCR received as a result of the May 13 inspection of DP-Tek's prototype unit.

In granting summary judgment for NCR, the district court acknowledged that Kansas recognizes the tort of interference with prospective business contracts, but then applied RESTATEMENT (SECOND) OF TORTS § 768 (1979) and held "that NCR's actions constituted privileged business competition." DP-Tech, 891 F. Supp. at 1528. On appeal, DP-Tek contends the district court erred when it: (1) held that Kansas would adopt the competitor privilege stated in section 768; (2) held that Kansas would interpret the "wrongful means" element of section 768 to require independently actionable conduct; and (3) placed on DP-Tek the burden of proving section 768 did not apply.

II.

A.

Standard of Review

We review a grant of summary judgment de novo. United States v. Agri Servs., Inc., 81 F.3d 1002, 1005 (10th Cir. 1996). Summary judgment is warranted only where there is no genuine issue as to a material fact and the movant is entitled to judgment as a matter of law. Id. The nonmovant "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of

material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmovant. Id. In applying this standard, we view the record and the reasonable inferences therefrom in the light most favorable to the nonmovant. Agri Servs., 81 F.3d at 1005.

Because this is a diversity case, we apply the substantive law of the forum state. Farmers Alliance Mut. Ins. Co. v. Salazar, 77 F.3d 1291, 1294 (10th Cir. 1996). "In the absence of authoritative precedent from the Kansas Supreme Court, however, our job is to predict how that court would rule." Carl v. City of Overland Park, 65 F.3d 866, 872 (10th Cir. 1995).

> [A] federal court's prediction of state law looks to (1) lower state court decisions and state Supreme Court dicta; (2) the lower court ruling in the case; (3) the general rule on the issue; (4) the rule in other states looked to by [Kansas] courts when they formulate their own substantive law, and (5) other available legal sources, such as treatises and law review commentaries.

Menne v. Celotex Corp., 861 F.2d 1453, 1464-65 n.15 (10th Cir. 1988).[4]

---

[4] Menne v. Celotex Corp., 861 F.2d 1453 (10th Cir. 1988), was decided prior to the Supreme Court's decision in Salve Regina College v. Russell, 499 U.S. 225, 231, 235 (1991), in which the Court held that an appellate court does not give deference to the district court's determination of state law. We do not apply the second factor here, therefore, although we view the district court opinion in this case as well reasoned. See id. at 232 ("Any expertise possessed by the district court will inform the structure and content of its conclusions of law and thereby become evident to the reviewing court.").

B.

Competition Privilege

The first issue is whether the district court erred when it predicted Kansas would adopt the competition privilege defense to the tort of interference with prospective business contracts expressed in the RESTATEMENT (SECOND) OF TORTS § 768.[5] We begin with the Kansas requirements for a claim of tortious interference with a prospective contract. They are:

> (1) the existence of a business relationship or expectancy . . .; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by the defendant; and (5) damages

---

[5] Section 768 provides:
> (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
> (a) the relation concerns a matter involved in the competition between the actor and the other and
> (b) the actor does not employ wrongful means and
> (c) his action does not create or continue an unlawful restraint of trade and
> (d) his purpose is at least in part to advance his interest in competing with the other.
> (2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

-8-

suffered by plaintiff as a direct or proximate cause of defendant's misconduct.

Turner v. Halliburton Co., 722 P.2d 1106, 1115 (Kan. 1986). Kansas recognizes that "not all interference in present or future contractual relations is tortious. A person may be privileged or justified to interfere with contractual relations in certain situations." Id.; see also Noller v. GMC Truck & Coach Div., 760 P.2d 688, 699 (Kan. Ct. App. 1988)("Intertwined in this problem are the actions of [the defendant], which may be justified or privileged--that is, proper rather than improper."), rev'd on other grounds, 772 P.2d 271 (Kan. 1989).

In Turner, the plaintiff alleged that his former employer tortiously interfered with his prospective employment by informing the new employer he had been discharged for stealing. 722 P.2d at 1111. The defendants argued they had a privilege to make the communications at issue. Id. at 1112. The court reasoned that "[o]ccasions privileged under the law of defamation are also occasions in which interference with contractual relations may be considered justified or privileged." Id. at 1116 (citing W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 129, at 989 (5th ed. 1984)). After quoting a New York appellate court that recognized such a privilege, as well as section 767 of the RESTATEMENT (SECOND) OF TORTS, the court held that where the tort was "based upon alleged defamatory statements . . . such communication is subject to

a qualified privilege which requires the plaintiff to prove actual malice by the defendant." Turner, 722 P.2d at 1117.

Citing Turner and Noller v. GMC Truck & Coach Div., 772 P.2d 271 (Kan. 1989), the district court held that the Kansas Supreme Court "would adopt the business competitor privilege set forth in § 768" because Kansas courts "have adopted other portions of the Restatement in regards to the torts of tortious interference." DP-Tek, 891 F. Supp. at 1521. DP-Tek argues that despite Kansas' reliance on section 767 in Turner, Kansas would not adopt the section 768 competition privilege. We are not persuaded.

First, DP-Tek contends that because the court in Turner relied only upon section 767, the court would not adopt the more specific provisions of section 768. Section 767 is the general balancing test applicable in tortious interference claims.[6] Section 767 is followed by sections 768 to 773, however, which

---

[6] Section 767 provides:
> In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
> (a) the nature of the actor's conduct,
> (b) the actor's motive
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the

-10-

illustrate the "specific applications of the factors set out in § 767 to certain types of factual patterns." RESTATEMENT (SECOND) OF TORTS, ch. 37, p. 7. "The rule stated in [section 768] is [thus] a special application of the factors determining whether an interference is improper or not, as stated in § 767." RESTATEMENT (SECOND) OF TORTS § 768 cmt. b. The court in <u>Turner</u> relied upon the general balancing test in section 767 because none of the specific fact patterns enumerated in sections 768-773 applied there. Consequently, it does not follow that the court's reliance on the general test of section 767 indicates its rejection of the specific privilege stated in the very next section.

Second, we find it significant that the court adopted in <u>Turner</u> a specific privilege not listed in section 767. The court expressly held that in cases where a former employer communicates allegedly defamatory statements from personnel files regarding a former employee, a qualified privilege "requires the plaintiff to prove actual malice." 722 P.2d at 1117. We glean from <u>Turner</u> that the Kansas Supreme Court would first determine whether a privilege exists for the interference alleged, then define the requirements of the privilege, and then determine whether the privilege is overcome under the facts of the case.

---

other,
     (f) the proximity or remoteness of the actor's conduct to the interference and
     (g) the relations between the parties.

Predicting how a court would rule is inherently difficult. Nonetheless, we are persuaded that the Kansas Supreme Court would adopt section 678.

C.

Wrongful Means

DP-Tek next contends the district court erred when it predicted Kansas would interpret the wrongful means element of section 768 to require independently actionable conduct. A competitor does not tortiously interfere with a prospective business relationship where "the actor does not employ wrongful means." RESTATEMENT (SECOND) OF TORTS § 768(1)(b). Wrongful means are described as

> [t]he predatory means discussed in § 767, Comment c, physical violence, fraud, civil suits and criminal prosecutions, are all wrongful in the situation covered by this Section. . . . If [a competitor] diverts [another] competitor's business by exerting a superior power in affairs unrelated to their competition there is no reason to suppose that his success [will] . . . promote the interest that is the reason for encouraging competition.

RESTATEMENT (SECOND) OF TORTS § 768 cmt. e.

We agree with the district court that in a claim for interference with a prospective contract, wrongful means requires independently actionable conduct. DP-Tek fails to recognize that both the Restatement and the Kansas Supreme Court distinguish between interference with existing contracts and interference with prospective contracts. RESTATEMENT (SECOND) OF TORTS § 768 cmt. h; Turner, 722 P.2d at 1115 ("While these torts tend to merge somewhat in the ordinary course, the former is aimed at preserving existing contracts and the latter

-13-

at protecting future or potential contractual relations.").  This distinction is

significant because

> depending upon the relative significance of the other factors, the
> actor's conduct in interfering with the other's prospective contractual
> relations with a third party may be held to be not improper, although
> his interference would be improper if it involved persuading the third
> party to commit a breach of an existing contract with the other.

Restatement § 767 cmt. e.

DP-Tek relies upon Colorado Interstate Gas v. Natural Gas Pipeline, 885

F.2d 683 (10th Cir. 1989), to support its assertion that the wrongful means

required by section 768 are not necessarily independently actionable conduct.  In

the context of interference with an existing contract, we said in that case although

"[t]here is some support for the proposition that conduct which is otherwise

lawful ought not form the basis of a tortious interference claim . . ., we believe

that the better position is that . . . motive can be a determinative factor in

converting otherwise lawful behavior into 'improper' conduct."  Id. at 691

(interpreting Colorado law and citing RESTATEMENT (SECOND) OF TORTS § 767

cmt. d)(citations omitted); see also RESTATEMENT (SECOND) OF TORTS § 767 cmt.

h ("The actor's conduct need not be predatory or independently tortious . . . .").

In the context of interference with a prospective contract, however, we

have said that "'wrongful means' refers to conduct such as 'physical violence,

fraud, civil suits, and criminal prosecutions.'" Occusafe, Inc. v. EG&G Rocky

-14-

Flats, Inc., 54 F.3d 618, 623 (10th Cir. 1995)(interpreting Colorado law and citing RESTATEMENT (SECOND) OF TORTS § 768 cmt. e)(emphasis added). In Occusafe, the plaintiff alleged the defendant interfered with its prospective economic advantage when it hired plaintiff's employees. We first held the parties were competitors, then held the alleged conduct was not wrongful within the meaning of section 768 and Colorado law.

Occusafe is more analogous to the present case than Colorado Interstate Gas because the latter case involved an existing contract and section 768 was therefore inapplicable. See RESTATEMENT (SECOND) OF TORTS § 768 cmt. h. Moreover, the defendants there did not assert a competitor privilege. Finally, we expressly relied in Colorado Interstate Gas on section 767, which requires a balancing of several factors. See RESTATEMENT (SECOND) OF TORTS § 767 cmt. a. To the extent we have previously addressed section 768, as we did in Occusafe, our interpretation of state law suggests independently actionable conduct is required.

The district court here refused to limit instances of wrongful means to those listed in section 768, comment e. It focused instead on whether the conduct was independently actionable. DP-Tek, 891 F. Supp. at 1522-23. In so doing, the court relied upon Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483 (8th Cir. 1992)(applying Minnesota law), to predict Kansas would require independently

actionable conduct.  <u>DP-Tek</u>, 891 F. Supp. at 1523.  In <u>Amerinet</u>, the Eighth

Circuit held that "'[w]rongful means,' as those words are used in Restatement

Section 768(b), 'refer[] to means which are intrinsically wrongful--that is,

conduct which is itself capable of forming the basis for liability of the actor.'"

972 F.2d at 1507 (quoting <u>Conoco, Inc. v. Inman Oil Co.</u>, 774 F.2d 895, 907 (8th

Cir. 1985)).

The Seventh Circuit has also held under Indiana law in a claim of tortious

interference with prospective contract that "it appears to be critical that the

defendant acted illegally in achieving his end."  <u>Great Escape, Inc. v. Union City</u>

<u>Body Co.</u>, 791 F.2d 532, 542 (7th Cir. 1986)(quoting <u>Biggs v. Marsh</u>, 446 N.E.2d

977 (Ind. Ct. App. 1983)).  The court was persuaded the Restatement supported

Indiana's standard:

> First, interference with prospective relations requires that more
> blameworthy means be used than does the tort of interference with
> contractual relations.  Thus, "when the means adopted is not innately
> wrongful . . . the interference is more likely to be found to be not
> improper."  Restatement of Torts § 766B Comment e.  The
> Restatement defines innately wrongful means as those that are
> tortious themselves.  Second, the Restatement requires especially
> egregious means to be employed when a competitor is seeking to
> expand its business.

<u>Id.</u>, at 542 n.6 (citing RESTATEMENT (SECOND) OF TORTS § 768).  Other

jurisdictions have interpreted the wrongful means element of section 768 to

require independently actionable conduct as well.  <u>See</u> <u>San Francisco Design Ctr.</u>

-16-

Assocs. v. The Portman Cos., 50 Cal. Rptr. 2d 716, 723 (Cal. Ct. App. 1995)("In order to defeat the privilege the defendant's conduct must be . . . independently actionable."), review dismissed, remanded and ordered published by 911 P.2d 1373 (Cal. 1996); Conoco Inc. v. Inman Oil Co., Inc., 774 F.2d 895, 907 (8th Cir. 1985)(same); Briner Elec. Co. v. Sachs Elec. Co., 680 S.W.2d 737, 741 (Mo. Ct. App. 1984)("[C]ompetitive conduct which is neither illegal nor independently actionable does not become actionable because it interferes with another's prospective contractual relations.").

The independently actionable standard finds support in the broad view of justified competition adopted in PROSSER & KEETON.

> In short, it is no tort to beat a business rival to prospective customers. Thus, in the absence of prohibition by statute, illegitimate means, or some other unlawful element, a defendant seeking to increase his own business may cut rates or prices, allow discounts or rebates, enter into secret negotiations behind the plaintiff's back, refuse to deal with him or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability.

PROSSER & KEETON § 130, at 1012-13 (footnotes omitted).

Few courts have clearly rejected the independently actionable standard. Some jurisdictions "'extend[] liability to cases where the defendant's actions are not independently unlawful.'" Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1167 (3d Cir. 1993)(interpreting New Jersey law)(citing Harvey S. Perlman, Interference with Contractual and Other Economic Expectancies: A Clash of Tort

-17-

and Contract Doctrine, 49 U. CHI. L. REV. 61, 78 (1982)). However, examination of these cases reveals that most involve tortious interference with existing contracts, see Colorado Interstate Gas, 885 F.2d at 691, or do not reference section 768 in their analysis of a competitor privilege, see Lightning Lube, 4 F.3d at 1167; Architectural Mfg. Co. of Am. v. Airotec, Inc., 166 S.E.2d 744, 746-47 (Ga. Ct. App. 1969).[7] In sum, we are convinced the weight of authority supports the conclusion that the wrongful means test of section 768 requires independently actionable conduct.

DP-Tek asserts that the requirement of independently actionable conduct renders the cause of action redundant to the underlying tort. We disagree.

> The damages recoverable for the underlying tort may be far smaller than those for interference with prospective economic advantage. Thus if Companies A and B are competing for a piece of lucrative business and A uses violence against the employees of B to prevail, these employees could presumably sue for battery. B's damages for intentional interference with prospective advantage, which depend in part on proof of the torts committed against its employees, would be far larger, however.

---

[7] DP-Tek cites a litany of additional cases as support for the rejection of the independently actionable standard. We have reviewed the cases and find them inapplicable for a variety of reasons. See, e.g., C.R. Bard, Inc. v. Wordtronics Corp., 561 A.2d 694, 698 (N.J. Super. Ct. Law Div. 1989)(involving existing contract); Michigan Ave. Nat'l Bank v. State Farm Ins. Cos., 404 N.E.2d 426, 431 (Ill. App. Ct. 1980)(holding that whether parties were competitors was not properly before court).

San Francisco Design Ctr., 50 Cal. Rptr. 2d at 723 n.9; see also PROSSER &

KEETON § 129, at 992 ("Thus in many cases interference with contract is not so

much a theory of liability in itself as it is an element of damage resulting from the

commission of some other tort, or the breach of some other contract." (footnotes

omitted)). In addition, if A and B are competing for the business of Company C

and A uses violence against the employees of C, B would have an independent

cause of action against A notwithstanding any cause of action the employees of C

might possess. This cause of action potentially increases liability where conduct

is otherwise actionable, and therefore is not redundant.

Based upon the Kansas Supreme Court's reliance in Turner on both the

RESTATEMENT and PROSSER & KEETON and our assessment of the general weight

of authority, we believe the Kansas Supreme Court would interpret wrongful

means to require independently actionable conduct.[8]

D.

The Merits

DP-Tek contends that, even if independently actionable conduct is required,

NCR engaged in several actions which constitute such conduct. DP-Tek first

alleges NCR tortiously pressured and induced Venture to breach its

---

[8] We note there may exist an exception where a plaintiff proffers evidence that the defendant exerted "a superior power in affairs unrelated" to the business in which they compete. RESTATEMENT (SECOND) OF TORTS § 768 cmt. e.

confidentiality agreement with DP-Tek when NCR enticed Venture with reduced prices. DP-Tek further alleges the reduced prices were conditioned on Venture providing NCR with unrestricted access to DP-Tek's prototype and confidential pricing information. The record does not support DP-Tek's allegations. DP-Tek has offered no evidence that reduced prices or any other advantageous terms were conditioned on access to the prototype or disclosure of confidential pricing.[9] Moreover, the Restatement authorizes "persuasion" and "limited economic pressure." RESTATEMENT § 768, cmt. e; see also PROSSER & KEETON § 130, at 1013 (stating that "a defendant may . . . cut rates or prices, allow discounts or rebates"). The mere offer of a more competitive bid epitomizes the goal of section 768. We agree with the district court that even if there was breach of the confidentiality agreement "it was an agreement to which NCR was not a party and which, of course it did not breach." DP-Tek, 891 F. Supp. at 1524. Accordingly,

---

[9] At most Venture gave NCR a price it considered competitive. Mr. Darell R. Zerbe, a Venture vice president, stated:
> [w]ell as much as they all tell their customers or potential customers 'Please treat my prices as confidential,' they all ask for the other guy's. So, you know, the customer is really in a position of having to honor both sides of that. The way I typically approach it is to tell them the number that I want them to hit. . . . [T]hen I come back into . . . reality, and it's usually based on what range we can go elsewhere and, you know, get reasonably close.

Aplt. App. at 1907.

-20-

neither NCR's disassembly of the prototype nor its access to the price range of DP-Tek's prototype constituted independently actionable conduct.

DP-Tek next alleges NCR made misrepresentations and disparaged the prototype with inaccurate and unverified information during its May 20 presentation. DP-Tek offers a litany of technical errors which involved issues such as power sources, number of serial ports, and processor speed. The district court thoroughly addressed this contention in its opinion below, relying in part on cases cited by DP-Tek on appeal. Id. at 1524-26. The district court concluded that

> [i]nevitably, competition in the marketplace will involve one competitor extolling the virtues of its product, while at the same time disparaging the virtues of a competitor's product. Such conduct is not per se actionable. . . . There is no evidence that NCR doubted the merits of the arguments they were making, or that NCR engaged in any type of fraudulent misrepresentation.

Id. at 1526. Substantially for the reasons given by the district court, we hold that any unfavorable or inaccurate statements made during the May 20 presentation do not rise to the level of independently actionable conduct.

DP-Tek further asserts NCR wrongfully used RCS as a source of confidential information. This assertion stems from information RCS received from DP-Tek during the integration meeting on May 19. Because NCR and RCS were business partners, DP-Tek alleges, there is a strong inference that the

confidential information NCR used in its presentation to Venture the following day was supplied by RCS.

We agree with the district court that DP-Tek fails to "present any legal argument as to why RCS' disclosure to NCR of any information revealed to it by DP-Tek was wrongful. There is no evidence of any confidentiality agreement between RCS and DP-Tek that would prevent RCS from disclosing such information." Id. at 1527. Accordingly, NCR's alleged acquisition of information from RCS does not constitute independently actionable conduct.

Finally, DP-Tek asserts that NCR wrongfully refused to offer its proprietary source code to RCS' software. DP-Tek does not identify any legal duty that required NCR to divulge its own proprietary software. Any undue economic pressure was the result of the incompatibility of DP-Tek's hardware and RCS' software. "Venture's selection process may have been flawed," id. at 1528, in that it did not require vendors to share codes. However, that failure does not raise NCR's refusal to the level of actionable conduct.

We are not persuaded that the conduct asserted singularly or in the aggregate constitutes independently actionable conduct. Accordingly, we hold that DP-Tek failed to overcome the competitor privilege of section 768.

E.

Burden of Proof

DP-Tek's final contention on appeal is that the district court erred when it placed on DP-Tek the burden of proving NCR's conduct was not privileged. We disagree. In Turner, the Kansas Supreme Court said that "a qualified privilege . . . requires the plaintiff to prove actual malice . . . ." Turner, 722 P.2d at 1117 (emphasis added). The court cited Leibowitz v. Szoverffy, 436 N.Y.S.2d 451 (N.Y. App. Div. 1981), as support for a qualified privilege, 722 P.2d at 1116, and Leibowitz in turn held that "[p]laintiff's failure to show the malice requirement essential to both her causes of action renders them insufficient." Leibowitz, 436 N.Y.S.2d at 453 (emphasis added). Although the court in Turner quoted 45 AM.JUR. 2d *Interference* § 27 (1969), which defines a justification or privilege as an affirmative defense, the court nevertheless expressly placed the burden of overcoming the justification or privilege on the plaintiff. Accordingly, the district court properly placed the burden of proof on DP-Tek.

The judgment of the district court is AFFIRMED.