DP–TEK, INC., Plaintiff,

v.

AT & T GLOBAL INFORMATION SOLUTIONS COMPANY (f/k/a NCR Corporation), Defendant.

No. 94–2115–JWL.

United States District Court, D. Kansas.

June 30, 1995.

Gregory L. Musil, Shughart, Thomson & Kilroy, Overland Park, KS, P. John Brady,

R. Lawrence Ward, Shughart, Thomson & Kilroy, Kansas City, MO, for DP–Tek Inc.

Lynn W. Hursh, Truman K. Eldridge, Jr., Darren S. Black, Armstrong, Teasdale, Schlafly & Davis, Robert G. Rooney, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, MO, Edwin L. Noel, Thomas B. Weaver, Armstrong, Teasdale, Schlafly & Davis, St. Louis, MO, James Greene, Robert L. Clark, AT & T Global Information Solutions Co., Dayton, OH, for NCR Corp.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

### I. Introduction

This case involves claims by plaintiff DP–Tek, Inc. against defendant AT & T Global Information Solutions Company ("AT & T") for tortious interference with a contract and tortious interference with a business relationship or expectancy. This matter is currently before the court on defendant AT & T's motion for summary judgment (Doc. # 115). In its motion, defendant AT & T seeks summary judgment on both of plaintiff's tortious interference claims. For the reasons set forth below, defendant's motion is granted.

### II. Factual Background

As of December of 1990, Venture Stores, Inc ("Venture") owned and operated a chain of approximately 80 discount retail stores. In late 1990, Venture decided to upgrade three separate components of the cash register and sales recording system in its stores: the cash register/point of sale hardware ("POS hardware"); the cash register/point of sale software ("POS software"); and each store's In–Store Processor ("ISP") system.[1] Venture's objectives in upgrading its system included increasing the capacity, functionality, reliability and flexibility of its registers and in-store computer system to meet its existing and future needs.

Pursuant to its desire to upgrade its computer system, in approximately March or April of 1991, Venture prepared and transmitted to various vendors Requests for Proposal ("RFP") for the three component parts of the Store Automation Project. The RFP included an overview of the RFP process and identification of Venture's general objectives for POS software and hardware, the POS controller, the ISP, a POS retrofit, and remote support requirements. During the RFP stages of the Store Automation Project, Venture indicated a desire to move toward a more open system than the IBM system that was then in place.[2] In addition to containing a preference for a more open system, the RFP also stated that Venture might accept proposals from vendors that involved proprietary codes. The preference for a more open system in part was a means to the end of achieving lower costs for the system. DP–Tek, NCR[3], and Research Computer Services ("RCS"), among others, received copies of the RFP.

In response to the RFP, DP–Tek, NCR, RCS and other vendors provided written information and also made presentations to Venture regarding their respective proposals and responses to the RFP. DP–Tek made a proposal regarding the POS hardware portion of the project. DP–Tek's proposal involved retrofitting Venture's existing POS IBM 3683 hardware. Among other things, DP–Tek's proposal involved placing a processor in the existing IBM cabinet and utilizing certain of the existing peripherals, including the printers. NCR made proposals for both the POS hardware component and the ISP component of the project.[4] Regarding

---

1. The replacement and upgrading of these three components shall be referred to as the "Store Automation Project."

2. In a "closed system," all of the components of the system are supplied by the same vendor. In an "open system," the components are supplied by various different vendors.

3. Defendant AT & T acquired NCR in 1991, and subsequently renamed the business AT & T Global Information Solutions Company. Because the defendant was known as NCR throughout the period of time in which DP–Tek's claims arise, and is referred to as NCR throughout all the documents offered in the record, the court will refer to defendant as NCR throughout the remainder of this opinion in an attempt to avoid confusion.

4. NCR was initially rejected by Venture as a potential vendor. However, due to its merger with AT & T, Venture subsequently allowed NCR

the POS hardware component, NCR proposed to sell new PC-based POS hardware rather than retrofitting Venture's existing equipment. RCS made a proposal regarding the POS software component of the project.

Based on the initial proposals Venture received from potential vendors involving new equipment, Venture was faced with a potential capital expenditure in the neighborhood of $20 million. The Store Automation Project was the largest capital project for computer equipment Venture had ever pursued up to that time. Based in part on the substantial difference between the list prices proposed for new registers and the proposed cost of DP–Tek's retrofits, Venture continued to pursue the DP–Tek proposed retrofit solution for the POS hardware.

On September 30, 1991, Darell Zerbe, Venture's Vice President of Management Information Systems, executed a Product and Service Master Agreement ("Master Agreement") presented to Venture by DP–Tek. The Master Agreement had been drafted by Robert Hess and Robert Nichols [5]. Hess was the General Manager and Nichols was Sales and Marketing Manager of DP–Tek's Major Product Division in St. Louis. The Master Agreement was executed by Robert Harbison, President of DP–Tek, on October 28, 1991. A purpose of the Master Agreement was to set out general contractual terms which would govern any future orders of products from DP–Tek by Venture. The Master Agreement contained the following provisions:

1.1 Customer agrees to purchase from DP–Tek and DP–Tek agrees to furnish to customer the products and services described in attached schedules signed by both parties.

1.2 All references to "Products and Services" in this Agreement are to the Products and Services listed in the attached schedules and on any agreements and schedules submitted to and accepted by DP–Tek pursuant to Section 2. All references to "Schedules" in this Agreement are to the sched-

ules attached hereto and to any schedules that are parts of any additional agreements incorporated herein pursuant to Section 2.

2.1 Customer and DP–Tek may from time to time agree upon additional Products and Services to be provided by DP–Tek. Such Agreements shall be written and shall describe the Products and Services to be provided, the timetable to provide them and the charges therefore. The terms of this Agreement shall automatically apply to and be incorporated in all such additional agreements whether or not this Agreement is expressly mentioned therein.

16.4 Unless otherwise provided in this Agreement, the Agreement shall not be modified except by written agreement signed by a duly authorized representative of both parties.

Also on September 30, 1991, Zerbe signed a document entitled Venture Stores, Inc., Store Automation Project Scope of Work ("Scope of Work"). Robert Harbison, DP–Tek's President, signed the Scope of Work on behalf of DP–Tek on October 28, 1991. Under the terms of the Scope of Work, DP–Tek agreed to produce and Venture agreed to purchase eight prototype retrofit units. In or about December, 1991, DP–Tek delivered to Venture six prototype units for which Venture paid $80,000 pursuant to the terms of the Scope of Work. Between the execution of the Master Agreement on September 30, 1991, and April 30, 1992, Venture engaged in ongoing communications with DP–Tek regarding the Store Automation Project, and specific issues regarding DP–Tek's proposed retrofit solution.

Also during the time period between September of 1991 and April 30, 1992, Venture was considering using RCS for the POS application software portion of the Store Automation Project and NCR for the ISP. RCS had submitted a proposal for application soft-

to receive an RFP and bid on the Store Automation Project.

5. Robert Hess was the General Manager and Robert Nichols the Sales and Marketing Manager of DP–Tek's St. Louis office.

ware which had been written to run on NCR POS hardware and to drive NCR peripherals to the NCR POS terminals. RCS had also submitted a "retrofit" software solution that did not involve any NCR POS hardware in existing stores.

In approximately March or April, 1992, Venture expressed its desire to accelerate the development and installation of any solution, and, in April of 1992 solicited from DP–Tek a revised proposal reflecting an additional quantity commitment and a shorter delivery and installation schedule, as well as additional pricing information. During this same time period, Bob Neel of Venture, who had become project manager of the Store Automation Project, also contacted other vendors in an attempt to obtain more competitive proposals. On or about April 17, 1992, DP–Tek gave to David Fink and Bob Neel of Venture an amended Schedule C containing proposed quantity commitments, an expedited delivery and installation schedule, and revised pricing and payment terms. This amended proposal included a request for a downpayment of over $1 million, due upon "final execution of this agreement."

On April 30, 1992, Venture's Darell Zerbe, David Fink and Bob Neel telephoned Bob Hess at DP–Tek to inform him that DP–Tek had been identified as the selected POS hardware vendor to move forward on the Store Automation Project. In that conversation, Hess said that DP–Tek wanted Venture to sign the revised proposal (Schedule C) and to pick up DP–Tek's proposed downpayment of more than $1 million. Zerbe had not heard about the downpayment and immediately told Hess that the request for such a substantial downpayment was a significant issue that he could not agree to, and he would need to discuss it further with Venture representatives. Venture representatives also placed calls on or after April 30, 1992, to NCR and RCS to notify them that they had been selected as vendors to move forward with the ISP and POS software components of the Store Automation Project, respectively.

Shortly after being advised that NCR had been identified as the vendor to go forward on the ISP component of the project, Richard Bruck of NCR discussed with Zerbe the possibility of NCR making a more competitive bid on the POS hardware component than NCR had previously made. The parties are in dispute as to whether Zerbe solicited this bid from NCR. However, there is no dispute that Zerbe did nothing to discourage such a bid and, in fact, indicated to Mr. Bruck that no final contract had been entered into with DP–Tek and such a bid would receive consideration.

On May 19, 1992, a meeting was held at Venture among representatives of Venture, DP–Tek, RCS and Equinox[6] at which the vendors were introduced and began discussing what would be necessary to integrate the components of the various vendors identified by Venture. At this meeting, Venture, RCS and DP–Tek began to address the magnitude of the programming necessary for integration between RCS' POS application software and DP–Tek's proposed retrofit unit POS hardware.

On and after May 20, 1992, NCR had discussions with and made a presentation to Venture regarding a revised proposal, which involved a reduction in pricing compared to its earlier proposal. After the reduction in pricing, the NCR proposal was approximately $750,000 more than the DP–Tek proposal. On May 28, after meetings within Venture considering the relative merits of the NCR proposal and the DP–Tek proposal, including issues of pricing, availability, stability and reliability, Phillip Otto, Venture's President, and Zerbe decided to pursue NCR's proposal as the primary solution for the POS hardware component of the project. Venture eventually signed a contract in August of 1992 to purchase POS hardware from NCR as part of its Store Automation Project, and ultimately the POS hardware was installed by NCR.

### III. Summary Judgment Standards

█ When considering a motion for summary judgment, the court must examine

---

6. Equinox was a subcontractor of DP–Tek which DP–Tek intended to utilize as part of its retrofit

proposal and was at the meeting at DP–Tek's request.

all the evidence in the light most favorable to the nonmoving party. *Langley v. Adams County, Colorado,* 987 F.2d 1473, 1476 (10th Cir.1993). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anthony v. United States,* 987 F.2d 670, 672 (10th Cir.1993). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

■■■ Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511; *Tersiner v. Union Pacific R. Co.,* 740 F.Supp. 1519, 1522–23 (D.Kan. 1990). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555.

## IV. Discussion

### A. Tortious Interference With a Contract

■■ Kansas law [7] has long recognized that one who, without justification, induces or causes a breach of a contract to which it is not a party will be answerable for damages caused thereby. *See Turner v. Halliburton Co.,* 240 Kan. 1, Syl. ¶ 7, 722 P.2d 1106 (1986). Under Kansas law, the elements essential to recovery for tortious interference with a contract are: (1) the contract; (2) the wrongdoer's knowledge thereof; (3) his or her in-

tentional procurement of its breach; (4) the absence of justification; and (5) damages resulting therefrom. *Dickens v. Snodgrass, Dunlap & Co.,* 255 Kan. 164, 169, 872 P.2d 252 (1994).

In Count I, DP–Tek claims NCR tortiously interfered with DP–Tek's existing contractual relationship with Venture for the sale of POS hardware units. Dp–Tek contends that the written Scope of Work Agreement executed by the parties was expressly adopted by the parties in subsequent oral negotiations which occurred in April and May of 1992. In the pre-trial order for this case, DP–Tek contends that "[a]s of May, 1992, a valid and enforceable contract existed between plaintiff and Venture regarding the development, production, delivery, and sale of point-of-sale retrofit units to Venture for installation in its retail stores. More specifically, during April and May, 1992, plaintiff and Venture reached agreement on the material terms of the sale of over 3,000 retrofit units for a total contract price of over $7,000,000." DP–Tek further contends that "NCR had knowledge of the agreement between plaintiff and Venture through, among other things, its participation in the vendor selection process, public announcements of selected vendors, and discussions with Venture employees."

■■ In order for DP–Tek to succeed on its tortious interference with a contract claim, DP–Tek must show both the existence of a contract between it and Venture for the sale of over 3000 POS hardware units with which NCR subsequently interfered and that NCR had knowledge of such contract. *See Dickens,* 255 Kan. at 169, 872 P.2d 252; *Macke Laundry Service Ltd. Partnership v. Mission Assocs., Ltd.,* 19 Kan.App.2d 553, 561, 873 P.2d 219 (1994); Restatement (Second) of Torts § 766. It is therefore necessary to examine the evidence regarding the negotiations between DP–Tek and Venture in order to determine if and when a contract for the sale of POS hardware units by DP–Tek to Venture was created. Upon examination of that evidence, it is apparent that the earli-

---

7. The parties are in agreement that Kansas law applies to the contract issues and tortious inter-

ference claims in the case.

est date upon which a contract for the sale and purchase of over 3000 POS hardware units arguably was created was May 21, 1992, which was the date that DP–Tek alleges that it and Venture orally agreed on "the quantity of retrofit units Venture would purchase, the price of the component parts from which Venture could choose, the down payment amount, and invoicing and payment terms." Accordingly, the court finds that DP–Tek's tortious interference with a contract claim fails because: (i) all of NCR's actions upon which DP–Tek bases its claim occurred prior to May 21, 1992; and (ii) DP–Tek has failed to allege any facts which would support an inference that NCR had knowledge of the alleged May 21, 1992 oral agreement.

The Scope of Work Agreement, signed by both DP–Tek and Venture in the Fall of 1991, includes terms for the purchase of eight (8) prototypes at a cost of $80,000. In the agreement, DP–Tek "proposes to custom design and manufacture a processor product for retrofit into 3683 registers for Venture." The agreement does contain Production Unit Pricing for the proposed retrofit of the registers. However, the agreement does not contain any language suggesting an agreement as to the actual purchase of any goods beyond the eight (8) prototypes.

To the extent that DP–Tek's argument can be interpreted to contend that the Scope of Work Agreement, standing alone, is sufficient to create a contract for the sale of POS hardware units to Venture, beyond the eight prototype units specifically mentioned, the court finds no merit to such an argument. There is simply no language in the Scope of Work Agreement evidencing an agreement between the parties to purchase any goods beyond the eight prototypes mentioned. Article 2 of the Uniform Commercial Code ("UCC"), adopted by Kansas [8] and applicable to this purported sale of goods, does not eliminate the requirement that the parties must have intended to enter into a binding agreement and that there be a mutual manifestation of assent on such a material point as whether the deal encompasses eight units or three thousand and some units and where the cost differential is in the range of seven million dollars. *See M.K.C. Equipment Co., Inc. v. M.A.I.L. Code, Inc.,* 843 F.Supp. 679, 684 (D.Kan.1994). Further, DP–Tek does not contend that there were any oral agreements contemporaneous with the execution of the Scope of Work Agreement that would evidence an agreement to purchase additional POS hardware units.

DP–Tek does cite to general Kansas authority to the effect that the U.C.C. was intended to liberalize traditional contract principles. *See Stanturf v. Quality Dodge, Inc.,* 3 Kan.App.2d 485, 596 P.2d 1247 (1979); *Christopher & Son v. Kansas Paint & Color Co., Inc.,* 215 Kan. 185, 523 P.2d 709 (1974); *Southwest Engineering Co., Inc. v. Martin Tractor Co., Inc.,* 205 Kan. 684, 473 P.2d 18 (1970); K.S.A. § 84–2–201. However, the Kansas cases cited by DP–Tek [9] do not stand for the proposition that a contract may be found absent either words or conduct that amount to a showing that the parties intended to make a binding agreement of the scope asserted.[10] In examining the cases cited by DP–Tek, it is clear that while Kansas courts recognize the liberalization of certain contract principles under the U.C.C., there is no authority which indicates that an agreement for the purchase and sale of eight units for $80,000.00 is equivalent to an agreement for the purchase and sale of over 3000 units for

---

8. K.S.A. § 84–2–101, *et seq.*

9. *Stanturf* stands for the idea that "[t]he U.C.C. liberalizes *certain* traditional contract principles, including the requirement that there be a meeting of the minds as to *every* facet of the agreement." *Id.* 596 P.2d at 1248–49 (emphasis added). *Christopher & Son* dealt with partial performance of a contract as a substitute for a writing. There the Kansas Supreme Court recognized that a contract for sale will not fail for indefiniteness due to missing terms because the U.C.C. provisions supply "missing terms needed for perfor-

mance, open price, remedies and the like." *Id.* 523 P.2d at 717. *Southwest Engineering* quotes the Kansas Comment to § 84–2–201 which states that "[t]erms relating to price, time, and place of payment or delivery, the general quality of goods, or any particular warranties may all be omitted." *Id.* 473 P.2d at 22. The Court also quotes the language of the comment stating that one of the three invariable requirements as to the writing is that it specify quantity. *Id.* at 22.

10. *See* K.S.A. § 84–2–204.

over $7,000,000.00. Because the Scope of Work Agreement contains no agreed upon quantity term for the sale of more than eight POS hardware units, and DP–Tek presents no other contemporaneous evidence of an agreement, either written or oral, it is apparent that the Scope of Work Agreement, standing alone, does not create a contract for the sale of POS hardware units beyond the eight prototype units mentioned in the contract.

The main thrust of DP–Tek's argument is that subsequent oral negotiations between it and Venture served as an oral modification of the earlier Master Agreement and Scope of Work Agreement and created a valid contract for the sale of over 3,000 retrofit units for a total contract price of over $7 million. Perhaps this argument is designed to relate the timing of the alleged oral agreement back to the inception of the original contracts so that a contract for over 3000 units was in existence at the time of the alleged interfering conduct.

DP–Tek cites no authority for the proposition that the terms of a subsequent modification of a contract would relate back to the original contract to enable a finding that actions taken by a person that interfere with the terms of the modification, which actions occurred after the original contract but prior to the modification, would constitute tortious interference. The court does not believe such a proposition is the law, for it would subject a person to liability who had absolutely no notice at the time his or her actions were undertaken that they would tortiously interfere with a modification of the contract that was not yet in existence.

■ In any event, DP–Tek's argument fails for the additional reason that the alleged May 21, 1992 oral agreement was not a valid modification of the original contracts. K.S.A. § 84–2–209(2) states that "[a] signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded...." The Master Agreement provides in 2.1 that any additional agreements "shall be written and shall describe the Products and Services to be provided, the timetable to provide them and the charges therefore." It further provides in 16.4 that "the Agreement shall not be modified except by written agreement signed by a duly authorized representative of both parties." Thus, because the parties agreed in their original writing that any modifications must be in writing, the court finds that, pursuant to K.S.A. § 84–2–209(2), any alleged oral agreement would not be effective to create a modification of the original agreement. The parties, in essence, agreed that they did not intend to be bound by any modification absent a writing and so there was no mutual manifestation of intent to be bound even if they did subsequently agree orally.[11]

■ Even though the alleged oral modification would not create a contract for the three thousand units which would relate back to the original contract, if an oral agreement was in fact reached by the parties at some point in time it could still possibly serve as the basis for a tortious interference with contract claim against NCR. A contract need not necessarily be legally enforceable against a third person in order for a tortious interference with contract action to lie. *See* Restatement (Second) of Torts § 766, comment f.[12] Thus, to the extent that any oral

---

11. Furthermore, because the contract at issue here is for the sale of goods in excess of $500, it is subject to the statute of frauds. Such contracts must be in writing and must specify a quantity term to be enforceable. *See* K.S.A. § 84–2–201. Even though DP–Tek alleges the oral agreement reached in April and May of 1992 was a modification of the earlier Scope of Work Agreement and Master Agreement, and even if the parties could somehow be construed to have waived the no oral modification clause, K.S.A. § 84–2–209(3) requires the modification to be in writing since "the original contract was subject to the statute of frauds and the quantity term is

modified." K.S.A. § 84–2–209, Kansas Comment 1983. Due to the failure of the parties to comply with the statute of frauds, any oral agreement reached by the parties in April and May of 1992 would not be enforceable under Kansas law, the significance of which is discussed two footnotes below.

12. Comment f of Restatement (Second) of Torts § 766 provides:

It is not ... necessary that the contract be legally enforceable against the third person. A promise may be a valid and subsisting contract even though it is voidable. The third person

agreement for the sale of additional POS hardware units could be said to be a separate contract, even though it would not be binding on Venture for failure to comply with the UCC's statute of frauds, it could possibly be sufficient to serve as the basis for a tortious interference with contract claim against NCR.[13] However, the court finds that under the facts presented in the record of this case, it is not necessary to determine whether an enforceable contract is required in order to sustain the cause of action.

Even if the court were to determine that oral negotiations between DP–Tek and Venture resulted in the creation of a voidable contract in May of 1992, and the court were to find that Kansas would recognize a tortious interference with contract action based on interference with a voidable contract, DP–Tek's claim would still fail for two separate reasons. First, DP–Tek has failed to show there was an existing contract at the time of the alleged interference by NCR. *See Macke Laundry Service Ltd. Partnership v. Mission Assocs., Ltd.,* 19 Kan.App.2d 553, 561, 873 P.2d 219 (1994); *Dickens,* 255 Kan. at 169, 872 P.2d 252. According to the facts as alleged by DP–TEK, it was not until May 21, 1992 that "DP–Tek and Venture had agreed on the quantity of retrofit units Venture would purchase, the price of the component parts from which Venture could choose, the down payment amount, and invoicing and payment terms." Plaintiff's SOAF, ¶ 113. DP–Tek makes no factual assertion that any oral agreement existed prior to May 21, 1992. However, all of NCR's actions upon which

DP–Tek bases its tortious interference claim occurred prior to May 21, 1992: (1) NCR's submission of a revised proposal to Venture in early May 1992; (2) NCR's analysis of the DP–Tek prototype on May 12, 1992; (3) NCR's pricing committee meeting on May 13, 1992, to set pricing to be competitive with DP–Tek; and (4) NCR's presentation of a revised proposal to Venture on May 20, 1992. Therefore, even assuming there was an oral agreement between DP–Tek and Venture on May 21, 1992, DP–Tek has made no showing of any interference with that agreement by NCR after its making.

Furthermore, in order to sustain a cause of action for tortious interference with a contract, DP–Tek must show that NCR was aware of the contract. *See Dickens,* 255 Kan. at 169, 872 P.2d 252; Restatement (Second) of Torts § 766, comment i. DP–Tek claims NCR had knowledge of the DP–Tek–Venture contract based on Venture's April 30th announcement. However, according to the facts contained in DP–Tek's oral modification argument, up until May 21, 1992, DP–Tek and Venture were still negotiating the essential terms of the agreement. The April 30th announcement could not have supplied NCR with knowledge of the oral contract when, according to DP–Tek, it was not even made until May 21, 1992. DP–Tek fails to allege any facts which would support an inference that NCR was on notice of the May 21, 1992 oral agreement between Venture and DP–Tek.

---

may have a defense against action on the contract that would permit him to avoid it and escape liability on it if he sees fit to do so. Until he does, the contract is a valid and subsisting relation, with which the actor is not permitted to interfere improperly. Thus, by reason of the statute of frauds, formal defects, lack of mutuality, infancy, unconscionable provisions, conditions precedent to the obligation or even uncertainty of particular terms, the third person may be in a position to avoid liability for any breach, The defendant actor is not, however, for that reason free to interfere with performance of the contract before it is avoided.

**13.** "[T]here is a diversity of authority as to whether the terms of the contract must be such that the refusal of performance constitutes an actionable breach of contract, in order that the

interference may constitute a tort. Some cases hold the affirmative, but according to other authority a tort may exist, although the contract may not be binding in law...." 86 C.J.S. Torts, § 44, p. 959, 965. Kansas has not directly addressed the question. However, based upon dicta contained in Kansas opinions, it is possible that Kansas would require a valid and enforceable contract to exist and would not recognize an action for tortious interference with a contract if that contract were voidable. *See Macke Laundry Service Ltd. Partnership v. Mission Associates, Ltd.,* 19 Kan.App.2d 553, 561, 873 P.2d 219 (1994) ("[a] claim for tortious interference with a contractual relationship requires the existence of a valid and enforceable contract at the time of the interference between the plaintiff and a third party").

Based on the record presented by the parties, the court finds that there is no evidence that a contract for the sale of over 3000 POS hardware units from DP–Tek to Venture existed prior to May 21, 1992. Further, even if a subsequent oral agreement was reached between DP–Tek and Venture on May 21, 1992, as alleged by DP–Tek, the court finds that DP–Tek has presented no evidence that NCR had knowledge of the subsequent oral agreement, nor has DP–Tek alleged any actions by NCR following that date that form the basis of its tortious interference with contract claim. Accordingly, the court finds that defendant is entitled to summary judgment on plaintiff's tortious interference with contract claim, which is Count I of plaintiff's complaint.

## B. Tortious Interference With a Prospective Business Relationship

Count II of DP–Tek's complaint is a claim for tortious interference with a prospective business relationship. The elements of a cause of action for tortious interference with a prospective business advantage or relationship under Kansas law are: (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct. *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986); *see also Noller v. GMC Truck and Coach Div., General Motors Corp.*, 244 Kan. 612, 772 P.2d 271 (1989); *Burrowwood Associates, Inc. v. Safelite Glass Corp*, 18 Kan.App.2d 396, 400, 853 P.2d 1175 (1993).[14] Tortious interference with a prospective business relationship requires some type of communication between the defendant and the third party in which the defendant induces the third party not to engage in a prospective contract or business relation with the plaintiff. A plaintiff claiming improper influence must demonstrate that the defendant knew of prospective contractual relations but intentionally interfered with them without justification. *See Women's Health Care Services, P.A. v. Operation Rescue–National*, 773 F.Supp. 258, 268 (D.Kan.1991), *rev'd on other grounds* 24 F.3d 107 (10th Cir.1994).

DP–Tek alleges that NCR undertook a carefully designed strategy to take Venture's business from DP–Tek and that NCR's actions satisfy the requirements necessary to support a claim of tortious interference with DP–Tek's prospective business relationship with Venture. The wrongful conduct by NCR alleged by DP–Tek includes: (1) conducting unauthorized and covert disassembly of DP–Tek's prototype and acquiring confidential, proprietary information unavailable anywhere else; (2) disparaging DP–Tek's prototypes and capabilities with inaccurate and unverified information; (3) extracting DP–Tek's confidential pricing from Venture after the bidding was closed and the contract awarded and using that price as a guide for its own belated price reduction; (4) using RCS as a source of confidential information concerning DP–Tek; and (5) derailing DP–Tek's chances of successfully participating in the Store Automation Project by refusing Venture's request for the source code to RCS' software.

NCR, on the other hand, contends that it did not engage in any conduct that could be

---

**14.** The Pattern Instructions for Kansas 2d, § 18.91, indicates in element four that the tort requires "misconduct by the defendant constituting actual malice," and defines actual malice to mean "actual evil-mindedness or specific intent to injure." As support for the instruction, the *Turner* case is cited. This court does not believe that the *Turner* case supports an interpretation that actual malice is required for a finding of wrongful conduct sufficient to support a tortious interference claim. While the *Turner* case does discuss an actual malice standard, that is only because the plaintiff's tortious interference claim was based upon alleged defamatory statements made by the defendant former employer. This court does not interpret *Turner* to require a showing of actual malice to support a tortious interference claim when the claim is not based upon defamation. Other Kansas authorities, and the Restatement, make no mention of an actual malice requirement. *See Noller v. GMC Truck and Coach Div., General Motors Corp.*, 244 Kan. 612, 772 P.2d 271 (1989); *Gillenwater v. Mid–American Bank and Trust Co.*, 19 Kan.App.2d 420, 870 P.2d 700 (1994); Restatement (Second) of Torts § 766B, comment d.

interpreted as wrongful for the purposes of a tortious interference with a prospective business relationship claim. NCR claims that as a business competitor of DP–Tek's for Venture's business, the actions it took to secure the Venture POS hardware contract were justified, and therefore do not constitute the type of wrongful conduct necessary to support DP–Tek's claim. NCR also claims that it is entitled to summary judgment because DP–Tek has failed to produce sufficient evidence that DP–Tek had a probability of future economic benefit from Venture or that DP–Tek's conduct was the cause of Venture's decision to discontinue discussions with DP–Tek.[15]

■ Restatement (Second) of Torts § 768 deals with determining whether a business competitor's interference with a prospective business relationship is proper or improper. The section provides as follows:

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor ... does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

Kansas has not specifically adopted the business competitor privilege set forth in § 768. However, this court has not been able to find a Kansas case in which the court was presented with a situation involving business competition that would make the section applicable. Kansas courts have noted that under certain circumstances a person or entity may be privileged or justified to interfere with either a contract or a prospective business relationship. This includes instances where the defendant acts in the exercise of a right at least equal to that of the plaintiff. *See Turner v. Halliburton,* 240 Kan. 1, 12, 722 P.2d 1106 (1986); *Gillenwater v. Mid–American Bank and Trust Co.,* 19 Kan. App.2d 420, 870 P.2d 700, 704 (1994); *see also Petroleum Energy, Inc. v. Mid–America Petroleum, Inc.,* 775 F.Supp. 1420, 1429 (D.Kan.1991). Further, given the fact that Kansas courts have adopted other portions of the Restatement in regards to the torts of tortious interference,[16] this court is convinced that were the Supreme Court of Kansas faced with the proper factual circumstance, such as that presented in this case, it would adopt the business competitor privilege set forth in § 768.[17]

In looking at the four factors set forth in § 768(1), it is apparent that there is no dispute that factors (a), (c) and (d) are applicable under the facts of this case. NCR and DP–Tek were in direct competition in attempting to secure the POS hardware contract with Venture. DP–Tek has made no allegation that any actions by NCR created or continued an unlawful restraint of trade. Finally, DP–Tek has not presented any evidence which would raise a question of fact as to whether NCR's purpose was at least in part to advance its interests in competing with DP–Tek.[18]

---

**15.** The court finds that questions of material fact exist as to whether DP–Tek had a probability of future economic benefit from Venture and as to whether DP–Tek's conduct was the cause of Venture's decision to discontinue discussions with DP–Tek. Therefore, NCR is not entitled to summary judgment on those grounds.

**16.** *See Turner,* 240 Kan. at 12, 722 P.2d 1106 (citing Restatement (Second) of Torts § 767 regarding justification for interference); *Noller v. GMC Truck and Coach Division, General Motors Corp.,* 244 Kan. 612, 620, 772 P.2d 271 (1989) (adopting the definition of intentional interference with prospective contractual relations contained in Restatement (Second) of Torts § 766B).

**17.** This court has previously applied the business competition privilege under Kansas law. *See Reazin v. Blue Cross and Blue Shield of Kansas, Inc.,* 663 F.Supp. 1360, 1492 (D.Kan.1987).

**18.** DP–Tek does contend that in early 1992, NCR had lost its POS hardware business at Sears Roebuck to a personal computer manufacturer called Compu–Ad, a previously unknown competitor in the POS industry which was of a size comparable to DP–Tek. DP–Tek alleges that NCR was "shocked" when it lost the contract to Compu–Ad and that NCR's headquarters gave instructions to its sales force, "Don't Let This Happen Again." DP–Tek alleges that NCR's earlier loss of the Sears contract to a small comput-

Thus, the question of whether NCR's actions were privileged business competition as described in § 768 rests with a determination of whether NCR employed "wrongful means" in its efforts to secure the Venture POS hardware contract. Precisely what constitutes "wrongful means" is somewhat difficult to state as a rule of law. However, this court believes that the proper analysis should begin with reference to the purposes underlying the business competition privilege. As stated in comment b of § 768: "[o]ne's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors. In order not to hamper competition unduly, the rule stated in the Section entitles one not only to seek to divert business from his competitors generally but also from a particular competitor. And he may seek to do so directly by express inducement as well as indirectly by attractive offers of his own goods or services."

The Restatement gives the following description of "wrongful means" under comment e:

If the actor employs wrongful means, he is not justified under the rule stated in this Section. The predatory means discussed in § 767, Comment c, physical violence, fraud, civil suits and criminal prosecutions, are all wrongful in the situation covered by this Section. On the other hand, the actor may use persuasion and he may exert limited economic pressure ...

The rule stated in this Section rests on the belief that competition is a necessary or desirable incident of free enterprise. Superiority of power in the matter relating to competition is believed to flow from superiority in efficiency and service. If the actor succeeds in diverting business from his competitor by virtue of superiority in matters relating to their competition, he serves the purposes for which competition is encouraged. If, however, he diverts the competitor's business by exerting a superior power in affairs unrelated to their competition there is no reason to suppose that his success is either due to or will result in superior efficiency or service and thus promote the interest that is the reason for encouraging competition....

NCR urges that instances of "wrongful means" should be limited to those actions specifically enumerated in comment e.[19] However, it is apparent that other courts have not been so restrictive. An actor's breach of fiduciary duty, such as recruiting plaintiff's customers for a new venture while still in the employ of the plaintiff, has been found to be "wrongful means." *See Corroon & Black of Illinois, Inc. v. Magner*, 145 Ill.App.3d 151, 494 N.E.2d 785, 98 Ill.Dec. 663 (Ill.App. 1 Dist.1986); *Smith–Shrader Co., Inc. v. Smith*, 136 Ill.App.3d 571, 483 N.E.2d 283, 91 Ill.Dec. 1 (Ill.App. 1 Dist. 1985). Other courts have found that misappropriation of trade secrets constitutes sufficient "wrongful means" to sustain a tortious interference claim. *See SI Handling Systems, Inc. v. Heisley*, 658 F.Supp. 362 (E.D.Pa.1986).

While courts have recognized certain instances of "wrongful means" beyond those specifically enumerated in § 768, in reviewing the decisions of other jurisdictions it is apparent that in situations involving a rivalry among direct competitors, broad latitude is given. This latitude has been justified on the grounds that tortious interference claims tend to have a chilling effect on vigorous competition for business, which in turn promotes lower prices, better products, and better services. *See Shearin v. E.F. Hutton Group, Inc.*, 652 A.2d 578, 589 (Del.Ch.1994); *see also Waldrep Bros. Beauty Supply, Inc.*

er company was a motivating factor behind NCR's aggressive pursuit of the Venture contract and its "attacks" against DP–Tek. However, even if the earlier loss of the Sears contract did indeed motivate NCR to be extra aggressive in its pursuit of the Venture contract, such motivation would not mean that NCR's purpose was not to advance its interest in competing with DP–Tek for the Venture contract. DP–Tek has presented no evidence indicating that NCR pursued the Venture contract not with a view to compete with DP–Tek for the contract, but rather solely to the satisfaction of spite or ill will towards DP–Tek without regard to the competitive nature of the bidding process. *See* Restatement (Second) of Torts § 768 comment g.

19. Those being physical violence, fraud, civil suits and criminal prosecutions.

*v. Wynn Beauty Supply Co., Inc.*, 992 F.2d 59, 63 (4th Cir.1993). For these reasons, courts have countenanced, in competitive situations, behavior which seems to strain the boundaries of propriety. *See, e.g., W. Oliver Tripp Co. v. American Hoechst Corp.*, 34 Mass.App.Ct. 744, 616 N.E.2d 118 (1993) (alleged false statements to promote sale of materials); *Caller–Times Pub. Co. v. Triad Communications, Inc.*, 855 S.W.2d 18 (Tex. App.—Corpus Christi 1993) (alleged predatory pricing); *C.R. Bard, Inc. v. Wordtronics Corp.*, 235 N.J.Super. 168, 561 A.2d 694 (1989) (alleged disparagement of plaintiff's products by use of a fictitious marketing survey); *Bar J Bar Cattle Co., Inc. v. Pace*, 158 Ariz. 481, 763 P.2d 545 (Ariz.App.1988) (alleged use of false statements to procure a contract); *Briner Elec. Co. v. Sachs Elec. Co.*, 680 S.W.2d 737 (Mo.App.E.D.1984) (alleged late submission of revised bid after plaintiff's bid was known to defendant); *Miller Chemical Co. v. Tams*, 211 Neb. 837, 320 N.W.2d 759 (1982) (anonymous mailing of plaintiff's customer price discount information to plaintiff's customer); *Candalaus Chicago, Inc. v. Evans Mill Supply Co.*, 51 Ill.App.3d 38, 366 N.E.2d 319, 9 Ill.Dec. 62 (Ill.App. 1 Dist.1977) (alleged wrongful sale of inferior goods to competitor's customer base with competitor's logo still on goods).

In attempting to draw the line between actionable and non-actionable, NCR urges this court to adopt the following analysis set forth by the Fourth Circuit:

> What constitutes improper means may be somewhat difficult to distill as a rule of law, but the perspective of consumer welfare provides some guidance. Business rivalry that promotes lower prices, better products, or more efficient services is justified, while business conduct that seeks to impose costs on rivals in order to gain an advantage in the market is not. It is the latter conduct that constitutes improper means under the law of civil conspiracy and cannot serve as justification under the law of intentional interference with contractual relations.

*Waldrep Bros. Beauty Supply*, 992 F.2d at 63.

This court believes that the test set forth by the Fourth Circuit in *Waldrep* is too narrow. Such a test would not cover instances in which a competitor undertook actions such as a breach of its fiduciary duty or misappropriated trade secrets as long as the competitor's objective was to gain a competitive advantage for itself and not to impose costs on its rival. This court believes such actions should clearly be classified as improper means.

■ Rather than adopt the approach set forth in *Waldrep,* this court believes that the proper test for whether conduct qualifies as improper means should be whether the conduct itself is capable of forming the basis of liability for the actor. This is the approach taken by the Eighth Circuit in *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483 (8th Cir. 1992). In discussing the competitor's privilege, the *Amerinet* court stated:

> In essence, [plaintiff] asserts that the competitor's privilege does not apply to [defendant's] actions because they were wrongful within the meaning of Section 768(b) of the Restatement. [Plaintiff] had the burden of introducing evidence to prove that [defendant's] conduct was beyond the scope of the competitor's privilege. "Wrongful means," as those words are used in Restatement Section 768(b), "refer[ ] to means which are intrinsically wrongful—that is, conduct which is itself capable of forming the basis for liability of the actor." "[C]ompetitive conduct which is neither illegal nor independently actionable does not become actionable because it interferes with another's prospective contractual relations."

*Id.* at 1507 (citations omitted).

DP–Tek contends that the following actions by NCR constitute wrongful means: (1) conducting unauthorized and covert disassembly of DP–Tek's prototype and acquiring confidential, proprietary information unavailable anywhere else; (2) disparaging DP–Tek's prototypes and capabilities with inaccurate and unverified information; (3) extracting DP–Tek's confidential pricing from Venture after the bidding was closed and the contract awarded and using that price as a guide for its own belated price reduction; (4)

using RCS as a source of confidential information concerning DP–Tek; and (5) derailing DP–Tek's chances of successfully participating in the Project by refusing Venture's request for the source code to RCS' software. After careful examination of the evidence presented by DP–Tek regarding each of these alleged wrongful actions, along with the applicable law, the court concludes that none of the alleged actions undertaken by NCR constitute "wrongful means" sufficient to overcome NCR's competitive privilege and form the basis for a tortious interference claim.

██ DP–Tek first contends that NCR's actions of conducting unauthorized and covert disassembly of DP–Tek's prototype and acquiring confidential, proprietary information unavailable anywhere else constituted wrongful means. DP–Tek asserts that NCR first learned of the DP–Tek retrofit prototypes in early May, 1992. DP–Tek further asserts that upon its discovery of the DP–Tek prototype competition, NCR was "frantic" because it would now have to change its entire strategy towards the Venture sale. DP–Tek contends that Brenda Pohl of NCR contacted Bob Neel of Venture regarding the retrofit units and was told that Venture was "definitely considering" them for its POS hardware needs. When Pohl asked Neel why the prototypes had been kept hidden, Neel referenced a "confidentiality agreement." DP–Tek asserts that Pohl pressured Venture to allow an NCR engineer to go to Venture to disassemble the DP–Tek prototypes so NCR could learn more about them. Venture agreed, and Barry Briggs, an NCR engineer, flew to Venture's offices in St. Louis on May 12, 1992. Mr. Briggs was escorted to the secured laboratory area within Venture by Venture's Kevin Stehlin. Mr. Briggs spent about four hours disassembling and inspecting the prototypes, during which time he prepared a report documenting the capabilities, functions and components in the prototypes and attempted to "cost out" the components. DP–Tek asserts that information from Mr. Briggs' report was used by NCR in making its subsequent re-bid on the POS hardware contract. DP–Tek contends it was not aware of the disassembly until after June 2, 1992, it never authorized any

such disassembly, and it never knowingly disclosed to NCR the detailed information contained in Briggs' memorandum.

DP–Tek asserts that NCR's inspection and disassembly of the prototype unit, with Venture's permission, constituted wrongful means because it violated a confidentiality agreement entered into between DP–Tek and Venture. DP–Tek has produced no authority that such actions would constitute wrongful means sufficient to support a tortious interference action, nor has this court been able to find any. The cases located by this court which have found a breach of a confidentiality agreement to constitute wrongful means typically have involved situations in which an employee, who has received confidential information due to his or her position as an employee of a corporation, has then proceeded to appropriate that information and used it in competition with the former employer. *See SI Handling Systems, Inc. v. Heisley,* 658 F.Supp. 362 (E.D.Pa. 1986). In those cases, it is the defendant who had been a party to a confidentiality agreement which the defendant then breached in attempting to compete. Here, NCR was given permission and allowed by Venture to inspect prototypes in Venture's possession and if that was a breach of a confidentiality agreement it was an agreement to which NCR was not a party and which, of course, it did not breach. If anything, DP–Tek would have a cause of action against Venture for breach of any confidentiality agreement. In any event, that conduct does not constitute wrongful means sufficient to support this tortious interference claim.

DP–Tek next contends that NCR disparaged DP–Tek's prototypes and capabilities with inaccurate and unverified information and that these communications by NCR to Venture constitute wrongful means. This allegation arises out of a May 20, 1992 meeting between representatives of NCR and Venture in which NCR made its re-bid presentation. DP–Tek asserts that throughout a program prepared and presented on an overhead projector, NCR specifically criticized the DP–Tek prototypes. DP–Tek further asserts that the presentation included threats that Venture might be subject to jail terms

and large monetary fines if it used the DP–Tek prototypes as its retail store solution due to the fact that the prototypes did not have FCC or Underwriter's Laboratory certification, when in fact NCR's engineer, Mr. Briggs, was aware that NCR's own research and development models were not certified and he had never warned NCR executives about possible jail terms or fines. DP–Tek further asserts that the background information from Mr. Briggs, upon which the presentation was based, was inaccurate in a number of respects, including important technical information such as: (1) it was wrong about the power source for the production units of the retrofit; (2) it was wrong about the number of serial ports; (3) it was wrong about the RS–232 connection; and (4) it was wrong about the processor speed. DP–Tek asserts that no one at NCR, including the engineer, Briggs, and the product manager who actually prepared and made the presentation, ever attempted to verify or confirm the information, conclusions, and assumptions contained in Briggs' report and in the presentation materials.

Several courts have dealt with the question of whether a competitor's communications to a third person, disparaging or critical of another competitor's product, constitute wrongful means sufficient to support a finding of tortious interference. In *W. Oliver Tripp Co. v. American Hoechst Corp.*, 34 Mass.App. Ct. 744, 616 N.E.2d 118 (1993), the plaintiff, Trippco, which was a graphic arts products distributor, brought an action against the defendant, Enco, which was a graphic arts products manufacturer. Enco cancelled its distribution agreement with Trippco based on its belief that Trippco was not adequately promoting its line. Trippco had been touting the merits of a developer manufactured by Sage, which was a competitor of Enco, over Enco's developer, based on the fact that Enco's developer gave off an offensive smell, while Sage's developer did not. Enco retaliated by warning potential customers that "Sage's chemicals would fail to develop Enco's plates properly and would gum up the works of Enco's processors." *Id.* at 747, 616 N.E.2d 118. Trippco contended that the accusations made by Enco about the problems associated with use of Sage's developer were untrue, and constituted wrongful conduct.

The appellate court sustained the trial judge's directed verdict in favor of Enco on the tortious interference claim. The court stated as follows:

> The interference of which Trippco complains is that Enco attempted—quite unsuccessfully one gathers from the record—to persuade end users to ditch Sage chemicals and use Enco chemicals instead. In doing so, Enco acted to promote sales of its product line and discourage sales of a competitor's product line. Those are altogether normal business objectives, and one supposes there is a societal consensus that persons should be free to act competitively. Of course competitive conduct must be within lawful bounds. Fraudulent misrepresentations or violation of antitrust laws, for example, would be impermissible. Although there was, in this case, a robust difference of opinion between Trippco and Enco about the technical justification for Enco's disparaging the Sage products in comparison to its own, that sort of puffery combined with reverse puffery would seldom amount to fraudulent misrepresentation. Certainly it did not in this case. There is no evidence that Enco's technical representatives had reason to doubt the merits of the technical arguments they were making about processing chemicals or that anyone relied on Enco's statements about processing chemicals to the detriment of Trippco. Enco, so far as the record shows, did not limit the sale of other Enco products (plates and processors) to customers who were not using Enco chemicals. Indeed, the Restatement (Second) of Torts § 768 expressly recognizes, as lawful, competitive conduct that does not employ unlawful means and does not create or continue an unlawful restraint of trade. For the reason, if no other, that the record describes only conduct of the kind we have described as lawful competition, the judge's direction of a verdict on the tortious interference count was correct.

*Id.* at 752, 616 N.E.2d 118.

*C.R. Bard, Inc. v. Wordtronics Corp.*, 235 N.J.Super 168, 561 A.2d 694 (1989) involved

competing manufacturers of artificial vascular grafts, a device used by medical surgeons. In February 1988, the Food and Drug Administration (FDA) adopted a regulation which required all manufacturers of vascular grafts to obtain from the FDA either premarketing approval or an investigational device exemption as prerequisites to the lawful marketing of their product. *Id.* 561 A.2d at 695. Plaintiff, which had marketed vascular grafts for many years prior to the FDA regulation, failed to comply with the FDA requirement, and continued to market its grafts without FDA approval. Sometime after the adoption of the FDA regulations, defendant Meadox employed defendant Wordtronics to assist it in the marketing of its vascular grafts. *Id.* Thereafter, Wordtronics sent letters to a number of health care providers whose names had been furnished by Meadox, informing them of the fact that there was no currently marketed vascular graft which had FDA approval. The contents of this letter were prepared by Meadox. After receiving the letter, numerous medical-care providers either returned their store of vascular grafts to plaintiff or cancelled their existing orders. *Id.* at 696.

The plaintiff claimed that it had been damaged as a result of this letter, and brought an action against defendants for the torts of interference with contractual relations, product disparagement and unfair competition. The plaintiff claimed that "[i]n a cunningly contrived masquerade conducted under the guise of an independent study by Wordtronics' nonexistent 'Health Care Research Division,' defendants conducted a poison pen campaign against Bard's product in an underhanded and deceptive attempt 'to get the market ready for (Meadox's) new competing graft.' Defendant's actions are clearly in violation of the standards of fairness and commercial morality imposed by the law of this State." *Id.*

The court granted defendant's motion for summary judgment, stating:

Plaintiff has not offered anything specific regarding its contention that defendant competed dishonestly. It has not demonstrated that defendant transgressed generally accepted standards of morality, nor

has it demonstrated that the truth was so shaded as to be misleading. Instead, it speaks in glittering generalities of bad motives and underhanded conduct, offering no proofs in that regard, nor with regard to either "recognized ethical business codes," or of "established customs or practices," which might prescribe unacceptable conduct. This is simply not enough.... Plaintiff's remedy is in the market place, not in the courts.

*Id.* at 698.

■ In the present case, the court finds that the representations made by NCR to Venture of which DP–Tek complains do not rise to the level of wrongful conduct sufficient to support a tortious interference claim. Inevitably, competition in the marketplace will involve one competitor extolling the virtues of its product, while at the same time disparaging the virtues of a competitor's product. Such conduct is not per se actionable. DP–Tek has not produced any evidence that NCR's statements to Venture violated ethical business codes or established customs and practices. There is no evidence that NCR doubted the merits of the arguments they were making, or that NCR engaged in any type of fraudulent misrepresentation. Accordingly, the court finds that the statements made by NCR to Venture do not constitute wrongful means.

■ DP–Tek next contends that NCR's actions in "extracting DP–Tek's confidential pricing from Venture after the bidding was closed and the contract awarded and using that price as a guide for its own belated price reduction" constituted wrongful means. As discussed above, the court finds that in fact no contract was ever awarded to DP–Tek for the POS hardware. Further, to the extent that DP–Tek's claim is based merely on the fact that NCR re-bid on the POS hardware after the initial period for accepting bids, the court finds that such action does not constitute actionable conduct. Venture was the entity in control of the bid process. The fact that Venture chose to entertain NCR's re-bid, which was made outside the parameters of the original timetable set forth by Venture for the bidding process, does not make NCR's conduct actionable. NCR's actions,

while perhaps unsporting, do not rise to the level of wrongfulness. The court believes that compliance with the bidding requirements is best left to the parties themselves, who stand in the best position to control that compliance. *See, e.g., Briner Elec. Co. v. Sachs Elec. Co.*, 680 S.W.2d 737 (Mo.App. E.D.1984) (successful subcontractor's blatant disregard of bidding documents, and conducting private negotiations unknown to any of its competitors, did not rise to level of wrongfulness that would satisfy element of absence of justification required for tortious interference with a valid business expectancy).

 The court also finds that NCR did not engage in any wrongful conduct in obtaining pricing information from Venture. The only confidentiality provision that DP–Tek points to in support of this argument is that contained in the Master Agreement executed between DP–Tek and Venture. The record does not reflect that NCR did anything more unscrupulous than request this information from Venture, which Venture provided. Merely because Venture arguably breached a confidentiality agreement it had with DP–Tek does not serve to make NCR's conduct in receiving information wrongful, absent any evidence that NCR unlawfully coerced or pressured Venture to give it such information.

DP–Tek also contends that NCR wrongfully used RCS as a source of confidential information concerning DP–Tek. Beginning in 1991, RCS was in a contractual relationship with NCR as NCR's business solutions partner. Since that time, all of RCS' services provided have been related to its partnership with NCR. The basic source code for application software used by RCS is licensed from NCR. DP–Tek contends that at a May 19, 1992 meeting that Venture had organized for the winning bidders to cooperate with each other in implementing the Store Automation Project, RCS received a copy of DP–Tek's confidential engineering specifications. On May 20, 1992, DP–Tek contends that NCR made a presentation to and had discussions with Venture that contained the same confidential information regarding the engineering of DP–Tek's prototypes. DP–Tek alleges that the extremely close business relationship between RCS and NCR, and the similarities between the information they presented, create a strong inference that NCR acquired the confidential information from RCS.

 The court finds this argument inherently flawed due to the failure of DP–Tek to present any legal argument as to why RCS' disclosure to NCR of any information revealed to it by DP–Tek was wrongful. There is no evidence of any confidentiality agreement between RCS and DP–Tek that would prevent RCS from disclosing such information. It was DP–Tek that chose to disclose the information. DP–Tek's mere belief that the information would not be passed on by RCS to NCR does not make NCR's conduct wrongful. DP–Tek might have been wise to have taken greater precautions in disclosing information that it wished to keep secret.

DP–Tek's final contention is that NCR "derailed DP–Tek's chances of successfully participating in the Project by refusing Venture's request for the source code to RCS' software." DP–Tek contends that at the May 19, 1992 meeting, Venture and DP–Tek learned for the first time that the scope of the software programming needed to connect the DP–Tek hardware and the RCS software was larger than anticipated. The most difficult problem of the communication interface was the presence of a software library called TAPS within the RCS software. TAPS was a proprietary software owned by NCR and licensed to RCS. DP–Tek asserts that Venture and DP–Tek realized that one possible solution to the interface communications issue was to simply obtain the TAPS library source code from its owner, NCR, so that the modifications to the software could be accomplished quickly and economically. Venture asked NCR if it would provide DP–Tek the source code and NCR refused. DP–Tek argues that this refusal to provide the source code constituted wrongful conduct.

 The court finds that this refusal by NCR to provide the source code simply does not constitute actionable conduct by NCR. DP–Tek produces no evidence or legal theory to show that NCR was obligated to provide this information to DP–Tek. The incompata-

bility of the DP–Tek hardware to coordinate with the RCS software indicates that Venture's selection process may have been flawed. However, the court does not see why DP–Tek's inability to run its hardware with RCS's software would automatically create an obligation on the part of NCR to provide DP–Tek with the source code. Absent any demonstrated legal obligation on the part of NCR to turn over the source code, the court finds its failure to turn over the source code does not constitute wrongful conduct sufficient to support DP–Tek's tortious interference claim.

Section 768 of the Restatement (Second) of Torts strikes a balance between unrestrained competition and protection of justified business expectations. In essence, the rule states that competitive conduct which is neither illegal nor independently actionable does not become actionable because it interferes with another's prospective contractual relations. NCR and DP–Tek were competitors for a lucrative contract to supply Venture with cash registers. NCR was the victor in the battle to secure that contract. While some of NCR's tactics may have been hyper aggressive, the court does not find that DP–Tek has produced sufficient evidence to suggest that any actions taken by NCR were illegal or independently actionable. Accordingly, the court finds that NCR's actions constituted privileged business competition and that summary judgment should therefore be granted on DP–Tek's claim for tortious interference with a prospective business relation.

## V. Conclusion

**IT IS, THEREFORE, BY THE COURT ORDERED THAT** defendant's motion for summary judgment (Doc. # 115) is granted.

**IT IS SO ORDERED.**