**Kenneth A. FLANAGAN, Plaintiff–Appellee,**

v.

**CONSOLIDATED NUTRITION, L.C., Defendant–Appellant.**

No. 99–2024.

Court of Appeals of Iowa.

March 28, 2001.

Stanley J. Thompson and Debra Rectenbaugh Pettit of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellant.

Richard J. Barry of Montgomery, Barry & Bovee, Spencer, for appellee.

Heard by STREIT, P.J., and HECHT and VAITHESWARAN, JJ.

STREIT, P.J.

A feed company that wanted a long-term contract to sell pigs to a farmer was content to abide by certain stringent rules regarding contract formation as long as those rules worked to its advantage. Now that the farmer claims the parties did not have a contract under those rules, the company argues more flexible rules should apply. We affirm the trial court's finding that the parties did not have a contract.

## I. Background Facts & Proceedings.

Kenneth Flanagan and Consolidated Nutrition dispute whether they have a contract to buy and sell pigs. Flanagan, an O'Brien County farmer, raises pigs at his wean-to-finish operation. Consolidated, an Iowa limited liability company with its principal place of business in Omaha, Nebraska, sells livestock feed products and pigs. Flanagan considered acquiring segregated early-weaned ("SEW") pigs[1] for his operation from Consolidated.

---

1. SEW pigs are weaned earlier (ten to twenty-one days old) than conventionally-weaned pigs (twenty-eight to thirty-five days old) and are housed in nurseries segregated from the rest of the pig population. This process is intended to protect SEW pigs from endemic diseases. *See Minnesota Impacts!: Performance of Segregated Early Weaned Pigs, at* http://www.extension.umn.edu/mnimpacts/impact.asp?projectID=21 (last visited Feb. 16, 2001).

Sometime before June 5, 1998, Flanagan received an unsigned document from Consolidated titled "Weaned Pig Sales Agreement." The document set forth a purchase price of $33.25 per SEW pig and a term of three-and-one-half years. Flanagan returned the document to Bob Kneip, Consolidated's district manager in Le Mars, on June 10 after making various changes to it. The changes included the following: (1) inserting "+/- 20 head" into the phrase "Buyer agrees to purchase from Consolidated, and Consolidated agrees to sell to Buyer, approximately 1050 Segregated Early Weaned Pigs ("SEW Pigs") each 9 weeks during the term of this agreement;" (2) inserting a definition of "competitive" into a paragraph requiring Flanagan to purchase his feed requirements from Consolidated "[f]or so long as Consolidated's feed products and services are competitive with other suppliers;" (3) inserting a liquidated damages clause; and (4) changing the choice of law provision from Nebraska to Iowa. Flanagan did not sign the document.

On June 25 Flanagan went to Consolidated's Le Mars office to review the company's revised version of the "Weaned Pig Sales Agreement;" Kneip was not present. The document included Flanagan's definition of "competitive" and a damages clause acceptable to him. It did not include the phrase "+/- 20 head" or an Iowa choice of law provision. Flanagan again made these two changes to the document, initialed his changes, and signed and left one copy of the document at the office. This is the only document bearing Flanagan's actual signature.

Before June 29 Flanagan received a telephone call from Kneip regarding delivery of SEW pigs. Flanagan agreed to accept delivery of several hundred SEW pigs from Consolidated for $33.25 per pig beginning June 29—the same day as the contract commencement date set forth in the "Weaned Pig Sales Agreement" Flanagan had signed June 25. Both Flanagan and Kneip agreed the parties were not buying and selling the pigs pursuant to that document because Consolidated had not yet accepted it and returned it to Flanagan.[2]

On July 15 Flanagan received another version of the "Weaned Pig Sales Agreement." Terry Myers, one of Consolidated's vice-presidents, had signed the document. Once again, it did not include the phrase "+/- 20 head" or an Iowa choice of law provision. Flanagan did not sign the document or return it to Consolidated.

On August 12 Kneip called Flanagan asking whether he was ready for the next delivery of SEW pigs from Consolidated. Flanagan told Kneip he was not going to accept the pigs because the parties did not have a contract. The following day, Flanagan sent a letter to Consolidated reiterating the parties did not have a contract and stating he was withdrawing the offer he had made to Consolidated in Le Mars.

On August 20 Flanagan received yet another copy of a "Weaned Pig Sales Agreement" from Consolidated. The document appears to be a copy of the "Weaned Pig Sales Agreement" Flanagan changed and signed on June 25 except for the following: (1) someone made editing marks on the document that were consistent with the format and content of the "Weaned Pig Sales Agreement" Flanagan received on July 15; (2) the first paragraph of the document included the type-

---

**2.** Kneip testified he did not recall saying Consolidated had not signed the "Weaned Pig Sales Agreement" as of June 29 and denied it was his opinion that, at that time, the parties did not have a contract. The trial court found Flanagan's testimony to the contrary more credible.

written date June 25, 1998; and (3) Flanagan's copied signature and Terry Meyer's signature are at the end of the document.

Sometime after August 20 Flanagan and Consolidated agreed to disagree about whether they had a contract. Flanagan bought SEW pigs from Consolidated until August 1999, but generally paid only market price for them—not the higher price set forth in the parties' purported contract. During this period, Flanagan received another "Weaned Pig Sales Agreement" from Consolidated that the company claimed was the parties' contract. The document, sent December 16, appears to be a copy of the "Weaned Pig Sales Agreement" Flanagan signed on June 25, except it does not have an attachment defining "competitive." Nor does the document contain the editing marks or typewritten date found in the "Weaned Pig Sales Agreement" Flanagan received August 20. The document does bear Flanagan's copied signature and Terry Meyer's signature.

Flanagan filed a petition for declaratory judgment asking the district court to find the parties did not have a contract. Consolidated filed a counterclaim asking the court to find Flanagan owed the company over $90,000 for the SEW pigs for which he had not paid $33.25 per pig. After a bench trial, the court found the parties did not have a contract under either the common law or the Iowa Uniform Commercial Code (U.C.C.). Consolidated appeals. The company claims the parties had a binding long-term contract in which Flanagan was obligated to buy approximately 1050 SEW pigs every nine weeks for three-and-one-half years.

## II. Scope of Review.

■ We review for correction of errors of law. *See* Iowa R.App.P. 4; *Van Oort Constr. Co. v. Nuckoll's Concrete Serv., Inc.,* 599 N.W.2d 684, 689 (Iowa 1999). We are not bound by the trial court's legal conclusions and application of legal principles. *See Hodges v. Hodges,* 572 N.W.2d 549, 551 (Iowa 1997). However, the trial court's findings of fact have the effect of a special verdict and are binding on us if supported by substantial evidence. *See Van Oort,* 599 N.W.2d at 689. "Evidence is substantial for purposes of sustaining a finding of fact when a reasonable mind would accept it as adequate to reach a conclusion." *Falczynski v. Amoco Oil Co.,* 533 N.W.2d 226, 230 (Iowa 1995). "We view the evidence in a light most favorable to the trial court's judgment." *Van Oort,* 599 N.W.2d at 689.

## III. The Merits.

Consolidated claims the U.C.C. applies to this case and, under the U.C.C., the parties had a contract. Specifically, Consolidated argues it presented Flanagan with an offer on June 25, 1998, in Le Mars and Flanagan accepted the offer that same day. Consolidated further argues the signed document Flanagan received on July 15 was a written confirmation of the parties' purported contract. *See* Iowa Code § 554.2207(1) (1997).

### A. The U.C.C.

■ Consolidated's starting premise is correct: The U.C.C. undoubtedly applies to this case. Article 2 of the U.C.C. applies to "transactions in goods." *Id.* § 554.2102. Goods include "all things . . . which are movable at the time of identification to the contract for sale other than the money which is to be paid, investment securities . . . and things in action." *Id.* § 554 .2105. Because this definition of "goods" encompasses livestock, article 2 governs the parties' purported contract to buy and sell SEW pigs. *See Embryo Progeny Assocs. v. Lovana Farms,* 203 Ga.App. 447, 416 S.E.2d 833, 834 (1992)

(noting sales of animals are transactions in goods); *Vince v. Broome,* 443 So.2d 23, 26 (Miss.1983) (same).

The facts of this case warrant a brief discussion about the relationship between article 2 and the common law of contracts. Article 2 relaxes many of the legal formalisms and technicalities of contract formation associated with the common law of contracts. For example, at common law "an offer [has] to be accepted exactly 'as is' or the response amount[s] only to a counter-offer." *Tralon Corp. v. Cedarapids, Inc.* 966 F.Supp. 812, 823 (N.D.Iowa 1997) (explaining the mirror-image rule); *cf. Shell Oil Co. v. Kelinson,* 158 N.W.2d 724, 728 (Iowa 1968) ("The rule is well settled that in a contract by offer and acceptance, the acceptance must conform strictly to the offer in all its conditions, without any deviation or condition whatever."). Similarly, when "an offer prescribes the place, time or manner of acceptance its terms in this respect must be complied with in order to create a contract." Restatement (Second) of Contracts § 60 (1981). In contrast, article 2 is less stringent: Section 554.2204(1) provides "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Section 554.2206(1)(a) provides "an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." Finally, section 554.2207(1) provides "[a] definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon."

Article 2 does not, of course, entirely eliminate the common law of con-

tracts. *See* Iowa Code § 554.1103 ("Unless displaced by the particular provisions of this chapter, the principles of law and equity . . . shall supplement its provisions."). Significantly, contracting parties like Flanagan and Consolidated must still reach an agreement in order to have an enforceable contract. *See DP–Tek, Inc. v. AT&T Global Info. Solutions Co.,* 891 F.Supp. 1510, 1517 (D.Kan.1995), *aff'd,* 100 F.3d 828 (10th Cir.1996) (stating article 2 "does not eliminate the requirement that the parties must have intended to enter into a binding agreement and that there be a mutual manifestation of assent on . . . material point[s]"). The relationship between this basic contract law principle and article 2's liberal rules regarding contract formation is as follows:

> [W]hen there is basic agreement, however manifested and whether or not the precise moment of agreement may be determined, failure to articulate that agreement in the precise language of a lawyer, with every difficulty and contingency considered and resolved, will not prevent formation of a contract [for the sale of goods]. But, of equal importance, if there be no basic agreement, the code will not imply one.

*Kleinschmidt Div. of SCM Corp. v. Futuronics Corp.,* 41 N.Y.2d 972, 395 N.Y.S.2d 151, 363 N.E.2d 701, 702–03 (1977).

Nor does article 2 prevent parties involved in "transactions in goods" from adhering—by choice—to the common law rules of contract formation that have been replaced by the article's less stringent rules. For example, section 554.2206(1) relaxes common law rules concerning the means and medium of an acceptance to a particular offer—"unless otherwise unambiguously indicated by the language or circumstances." Iowa Code § 554.2206(1). Consequently, "where the circumstances indicate that a particular

manner of contract formation is contemplated by the parties, a binding contract is not formed in the absence of compliance with the contemplated procedure." *Jim L. Shetakis Distrib. Co. v. Centel Communications Co.*, 104 Nev. 258, 756 P.2d 1186, 1188 (1988).

■ Equipped with this background information, we turn to the remainder of Consolidated's argument: As was stated previously, Consolidated argues it presented Flanagan with an offer on June 25, 1998, in Le Mars and Flanagan accepted the offer that same day. Consolidated further argues the July 15 document, with Flanagan's copied signature, was a written confirmation of the parties' purported contract.

## B. Existence of a Contract.

The remainder of Consolidated's argument is misguided. Implicit in the company's argument that Flanagan accepted its offer on June 25 is the assumption the parties actually reached an agreement on that date. This assumption contradicts, of course, the trial court's finding that Consolidated and Flanagan had "no contract under the U.C.C." *See* Iowa Code § 554.1201(11) (stating a contract is the "total legal obligation which results from the parties' agreement").

We are bound by this finding of fact if it is supported by substantial evidence. *See Van Oort*, 599 N.W.2d at 689; *see also Audus v. Sabre Communications Corp.*, 554 N.W.2d 868, 871 (Iowa 1996) (stating the existence of an oral contract is ordinarily a question of fact); 2 Ronald A. Anderson, *Uniform Commercial Code* §§ 2–204:59–60, at 408–09 (3rd ed.1996) (stating the existence of a contract under the U.C.C. is generally a question of fact). Here, as will be discussed in greater detail below, the record shows Flanagan and Consolidated's concerted efforts to reach

an agreement never culminated in a binding contract because they did not adhere to their self-imposed rules of contract formation. *See Jim L. Shetakis Distrib. Co.*, 756 P.2d at 1188. Accordingly, we must affirm the trial court.

Flanagan and Consolidated contemplated they would not have a binding contract until they both signed a "Weaned Pig Sales Agreement" that had been processed and approved by appropriate Consolidated personnel. Consolidated complains the facts tell a different story. The company's own conduct, however, belies its protestations. For example, after Flanagan signed the "Weaned Pig Sales Agreement" on June 25, Consolidated sent him a letter stating they would "get [his] contract back" after he gave them his financial statement—the implication being that some additional things had to happen before the parties had a binding contract. Moreover, when Consolidated returned the "Weaned Pig Sales Agreement" to Flanagan on July 15, it was a new version that did not incorporate all of Flanagan's June 25th alterations. Indeed, a Consolidated employee subsequently wrote a memo characterizing the document as a "new contract"—a fact at odds with the company's present claim the document merely confirmed the parties' purported June 25 contract. Rather, such conduct is consistent with the supposition the parties would not have a binding contract until they both signed a "Weaned Pig Sales Agreement" that had been processed and approved by appropriate Consolidated personnel.

Flanagan and Consolidated never timely complied with this manner of contract formation. The above-discussed conduct demonstrates that, as late as July 15, the parties were still engaged in efforts to reach an agreement. On August 12 Flanagan informed Consolidated he did not believe the parties had a contract and effec-

tively revoked any offer he had made to the company. *See Emmons v. Ingebretson*, 279 F.Supp. 558, 573 (N.D.Iowa 1968) ("An offer may be withdrawn by a communication prior to acceptance which expressly or by implication notifies the offeree that the offeror does not intend to perform the contract."). On August 20 Flanagan received a "Weaned Pig Sales Agreement" from Consolidated bearing each party's signature. The inconsistencies between this document, the document Consolidated had delivered to Flanagan in July, and the document Consolidated later sent to Flanagan in December support the trial court's finding the August 20 document was part of Consolidated's belated attempt to establish the parties had a binding contract. These efforts by Consolidated to finally comply with the parties' self-imposed rules of contract formation were made after the company learned Flanagan was no longer interested in entering into a long-term contract—and, consequently, were made too late.

Thus, to reiterate, substantial evidence supports the trial court's finding that Flanagan and Consolidated had "no contract under the U.C.C." In reaching this conclusion, we have not overlooked the fact that on June 29, July 2, and July 6 of 1998 Flanagan accepted delivery of several hundred SEW pigs for $33.25 per pig—the price set forth in every "Weaned Pig Sales Agreement" exchanged between the parties. Consolidated argues this conduct demonstrates the existence of a binding

long-term contract between the parties. *See* Iowa Code § 554.2204. Flanagan testified, however, the parties bought and sold these SEW pigs pursuant to a separate agreement because they did not have a binding long-term contract at that time. His explanation for his conduct is consistent with the theory of the case discussed above. Accordingly, we uphold the trial court's finding that Flanagan's testimony regarding this matter was more credible.

### IV. Conclusion.

The facts and circumstances of this case show that Flanagan and Consolidated considered their interplay, their exchange of differing drafts, their proposals and counterproposals, as part of the dialogue of parties seeking to reach an agreement. They never met their goal. Consolidated cannot now ignore the parties' self-imposed rules of contract formation, wind back the clock, point to one of the earlier moments in the parties' contracting dialogue, and claim the parties had a binding contract as of that time. We affirm the trial court. Flanagan and Consolidated did not have a contract to buy and sell SEW pigs.

**AFFIRMED.**