**IN THE COURT OF APPEALS OF IOWA**

No. 19-1903
Filed January 21, 2021

**GLEN D. HANSON,**
      Plaintiff-Appellant,

**vs.**

**MARK MAEDER and MAEDER MGT., LIMITED LIABILITY COMPANY,**
      Defendants-Appellees.
_____

      Appeal from the Iowa District Court for Adair County, John D. Lloyd, Judge.

      Glen Hanson appeals the district court's denial of his breach of contract claim. **AFFIRMED.**

      Jeff W. Wright and Allyson C. Dirksen, Sioux City, for appellant.

      Jami J. Hagemeier of Williams & Hagemeier, P.L.C., Des Moines, for appellees.

      Considered by Bower, C.J., and May and Ahlers, JJ.

**MAY, Judge.**

Glen Hanson and Mark Maeder[1] made oral agreements concerning Hanson's farmland and cattle. In this appeal, Hanson challenges the district court's determinations that (1) Hanson was not entitled to repurchase certain cattle and (2) Hanson contracted with Maeder's company—Maeder MGT., LLC—rather than Mark Maeder individually. We affirm.

**I. Background Facts and Proceedings**

Hanson is a physician who owns farmland and a cattle operation. Maeder has his own farmland and cattle operation in the same area. In March 2012, Hanson was injured. He claims his injuries prevented him from caring for his farm and cattle. From approximately March 2012 to February 2013, Maeder cared for Hanson's farming operation. And Hanson paid Maeder $100,180 for his services.

By February 2013, Hanson entered into two new oral agreements with Maeder. One agreement concerned rental of Hanson's farmland for a set cash rate. The second agreement concerned the care of Hanson's cattle. As part of this second agreement, Hanson sold Maeder a one-half interest in his cattle herd at the agreed upon price of $204,800, which Maeder paid in full. No specific animals were identified as being sold to Maeder. As will be discussed further, Hanson contends he and Maeder also agreed that Hanson would have the option to repurchase some or all of Maeder's interest in the herd at the same price within the next five years.[2] Meanwhile, the parties agree, Maeder would care for the joint

---

[1] Mark Maeder owns Maeder MGT., LLC. For ease of reference, we often refer to both entities as Maeder.
[2] Hanson believed he would know within five years whether he would fully recover from his injuries and be able to resume caring for his own operation.

herd and Hanson's farm operations. In exchange, Maeder would receive (1) the calves from his half of the herd plus (2) two-thirds of the calves from Hanson's half of the herd. All told, then, Maeder would receive five-sixths of the calves born in the joint herd. This left Hanson with one-sixth of the calves.

We emphasize Hanson and Maeder's agreements were all verbal. The only document signed by both parties to reflect their arrangement was executed on July 13, 2014—fifteen months after their arrangement started. It includes the provisions outlined above—but it does not mention any option to repurchase cattle.

On August 31, 2015, Hanson mailed a written termination notice to Maeder. It stated:

> This letter is to terminate my present cattle sharing and farm rental agreement with you and/or Maeder Management LLC. I will be discussing a future contract with my financial advisors and then discuss their recommendation with you. . . . Termination date for our present arrangement is March 1, 2016.

In December 2015, Maeder split the herd in half and placed his half on his property. No cash or cattle changed hands between Hanson and Maeder on or before March 1, 2016, the termination date specified in Hanson's August 2015 letter. In April 2016, Maeder commingled his half of the herd with his own cattle. On April 25, Hanson sent Maeder a letter that read in part:

> Per our written contract of 3/1/2012[3] I am buying back your share of our cattle herd. As you recall, I can exercise this option within 5 years from 3/1/2012 if I am physically able to care for the cattle again. I notified you last fall that it was my intent to buy back most if not all of your share of our herd. I asked you for an audit of cattle numbers, calving records, and sale receipts . . . . These were not forthcoming.

---

[3] As already mentioned, all of Hanson and Maeder's agreements were verbal. There was no written contract. Additionally, Hanson testified at trial that the date reflected in the letter is wrong. The correct date is March 1, 2013.

Hanson then brought this suit against Maeder. After a bench trial, the district court awarded Hanson $16,640.36 against Maeder MGT., LLC for property damages incurred during the parties' agreements. The court dismissed all claims against Mark Maeder individually because, in the court's view, Hanson's agreements were with Maeder MGT., LLC. The court also denied Hanson's claim for breach of contract to repurchase cattle. Hanson appeals.

## II. Standard of Review

We review a breach of contract action for correction of errors at law. *Iowa Mortg. Ctr., L.L.C. v. Baccam*, 841 N.W.2d 107, 110 (Iowa 2013). We will affirm if substantial evidence supports the district court's findings of fact. *Id.* But we are not bound by the court's conclusions of law or application of legal principles. *Id.*

## III. Analysis

Hanson claims the district court erred in holding that (1) Maeder was not required to sell Maeder's interest in the herd back to Hanson according to an oral repurchase option and (2) Hanson's agreements were with Maeder MGT., LLC. We address each argument in turn.

### A. Oral Repurchase Option Contract

Hanson argues Maeder breached an oral contract by failing to sell and deliver one-half of the herd to him. To prevail on this claim, Hanson has to prove: (1) the contract existed; (2) the contract's terms and conditions; (3) Hanson performed all the terms and conditions required; (4) Maeder breached the contract in some particular way; and (5) Hanson suffered damages as a result of Maeder's breach. *See id.* at 110–11; *Anderson v. Douglas & Lomason Co.*, 540 N.W.2d

277, 283 (Iowa 1995) ("As with any contract, the party who seeks recovery . . . has the burden to prove the existence of a contract.").

The first two elements—the existence of a contract and its terms—are closely related. Ordinarily, a contract cannot exist unless there is a "meeting of [the] minds" about the core terms of the contract. *Harris v. Manning Indep. Sch. Dist.*, 66 N.W.2d 438, 442 (Iowa 1954). Put another way, there is usually no contract unless *both* parties express their agreement—their "mutual assent"—to the essential terms. *Schaer v. Webster Cnty.*, 644 N.W.2d 327, 338 (Iowa 2002). For example, "[i]f there is a misunderstanding . . . [as] to the object of the agreement so that 'one party [understands] [it] is buying one thing and the other party thinks [it] is selling another thing, no meeting of the minds occurs, and no contract is formed.'" *Id.* (third, fourth, and fifth alterations in original) (quoting *Hill-Shafer P'ship v. Chilson Fam. Tr.*, 799 P.2d 810, 814 (Ariz. 1990)).

Here, the district court found Hanson failed to prove the alleged contract—or, put differently, the terms of the contract—because there was no meeting of the minds as to what Hanson would have the right to repurchase. There was no agreement, the court found, as to whether (a) Hanson had a right to repurchase "particular animals at [Hanson's] election" or (b) Hanson only had a right to "repurchase [Maeder's] entire half-interest" in the joint herd.

We find no reason to reverse. Hanson points to no definitive evidence of what cattle—or interest in cattle—the parties mutually agreed to resell. And Hanson himself made contradictory statements as to whether he had the right to repurchase individual cattle of his choosing or, instead, the mere right to repurchase an undivided one-half of the joint herd.

To be clear, though, we agree with Hanson on several points. For instance, we agree a contract for the sale of cattle is governed by Article 2 of the Uniform Commercial Code (UCC), which is codified as Iowa Code chapter 554 (2017). *See, e.g.*, *Kanzmeier v. McCoppin*, 398 N.W.2d 826, 831 (Iowa 1987); *Flanagan v. Consol. Nutrition, L.C.*, 627 N.W.2d 573, 577 (Iowa Ct. App. 2001) (holding Article 2 governed purported contract "to buy and sell . . . pigs"). And we agree "Article 2 relaxes many of the legal formalisms and technicalities of contract formation associated with the common law of contracts." *Flanagan*, 627 N.W.2d at 578. Indeed, as Hanson points out, under Article 2's "open terms" principle:

> If the parties intend to enter into a binding agreement, this subsection recognizes that agreement as valid in law, despite missing terms, if there is any reasonably certain basis for granting a remedy. The test is not certainty as to what the parties were to do nor as to the exact amount of damages due the plaintiff. Nor is the fact that one or more terms are left to be agreed upon enough of itself to defeat an otherwise adequate agreement. Rather, commercial standards on the point of "indefiniteness" are intended to be applied, this Act making provision elsewhere for missing terms needed for performance, open price, remedies and the like.

U.C.C. § 2-204 cmt. (Am. L. Inst. & Unif. L. Comm'n 2011).[4]

And so it is true that, in some circumstances, Article 2 can "fill in" terms for which the parties made no specific provision. For example, under section 554.2308, if the parties' agreement does not specify a place for delivery, "the place for delivery of goods" is usually "the seller's place of business or if the seller has none the seller's residence." *See e.g.*, Iowa Code § 554.2305 (providing procedure to determine price where parties intended to "conclude a contract for

---

[4] Section 2-204 of the Uniform Commercial Code is codified at Iowa Code section 554.2204.

sale even though the price is not settled"); *id.* § 554.2307 (providing for delivery procedures that apply "[u]nless otherwise agreed").

But Hanson has not cited, and we have not found, any part of Article 2 that could specify what cattle must be sold—the very heart of this alleged contract of sale—if there was no agreement on that issue. Rather, based on the current record and briefing, we conclude that because Hanson failed to prove an agreement as to what cattle he could repurchase, he failed to prove an enforceable contract. *See Flanagan*, 627 N.W.2d at 578 (noting "if there be no basic agreement, the code will not imply one") (quoting *Kleinschmidt Div. of SCM Corp. v. Futuronics Corp.*, 363 N.E.2d 701, 702–03 (N.Y. 1977)); *see also id.* ("Article 2 does not, of course, entirely eliminate the common law of contracts. Significantly, contracting parties like Flanagan and Consolidated must still reach an agreement in order to have an enforceable contract."(citation omitted)); *Tubelite Co. v. Original Sign Studio, Inc.*, 891 N.E.2d 820, 825 (Ohio Ct. App. 2008) ("However, in the absence of some basic terms—such as the description and quantity of the goods—a contract may not exist."); *A & A Mech., Inc. v. Thermal Equip. Sales, Inc.*, 998 S.W.2d 505, 509 (Ky. Ct. App. 1999) ("The requirement that there be a basis for relief, however, necessitates that the contract provide a quantity term, for without such a term that basis is lacking.").

The record supports the district court's conclusion that Hanson failed to prove the existence of a contract or, at a minimum, the essential terms of the contract. So the district court was right to deny recovery for breach of contract.

**B. Maeder**

We turn next to Hanson's argument that the district court "went against the substantial weight of the evidence" by concluding Hanson's agreements were with Maeder MGT., LLC, rather than Mark Maeder. Before we consider the record, though, we must clarify the standard of review. The question before us is not whether "the substantial weight of the evidence" supports one finding or another. Rather, the district court's findings "have the force of a jury verdict and are binding on the reviewing court if based upon substantial evidence." *Jackson v. Wesselink*, No. 10-0504, 2011 WL 649471, at *2 (Iowa Ct. App. Feb. 23, 2011).

> A finding of fact is supported by substantial evidence if the finding may be reasonably inferred from the evidence. In evaluating sufficiency of the evidence, we view it in its light most favorable to sustaining the court's judgment. We need only consider evidence favorable to the judgment, whether or not it was contradicted.

*Keppy v. Lilienthal*, 524 N.W.2d 436, 438 (Iowa Ct. App. 1994) (quoting *Briggs Transp. Co. v. Starr Sales Co.*, 262 N.W.2d 805, 808 (Iowa 1978)). And "[w]e are prohibited from weighing the evidence or the credibility of the witnesses." *Id.*

With these principles in mind, we note the following: As the district court correctly pointed out, Hanson's own termination letter dated August 31, 2015, stated he was terminating the "present cattle sharing and farm rental agreement with you [Mark Maeder] and/or Maeder Management LLC."[5] And Hanson wrote a check payable to "Maeder MGT." Plus, Hanson later cashed a check from "Maeder MGT." Also—and perhaps most significantly—the only document signed by both

---

[5] Hanson testified at trial that he "was totally unaware" of the entity known as Maeder Management, LLC or Maeder MGT., LLC "until these proceedings." But he does not explain how the LLC designation appeared in the termination letter.

parties describes the parties as Glen Hanson and "Maeder MGT.," with Mark Maeder signing for "Maeder MGT." Of course, not all these documents included the initials "LLC." But, viewed in the "light most favorable to sustaining the court's judgment," all of these documents seem to refer to a business entity that is separate from Mark Maeder the individual. *See id.* (citation omitted).

Viewing the record in the "light most favorable to sustaining the court's judgment," we conclude substantial evidence supports the finding that Hanson contracted with Maeder MGT., LLC, rather than Mark Maeder individually. *See id.* (citation omitted).

## IV. Conclusion

We find no grounds for reversal.

**AFFIRMED.**